No. 12-56060

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

**T.B., by and through his Guardian ad Litem,
ALLISON BRENNEISE and ROBERT BRENNEISE**

**Plaintiffs-Appellants**

**v.**

**SAN DIEGO UNIFIED SCHOOL DISTRICT,**

**Defendant-Appellee**

## APPEAL FROM UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

## APPELLANTS' PETITION FOR PANEL REHEARING

| | |
|---|---|
| **Steven Wyner (SBN 77295)** | **Marcy J.K. Tiffany (SBN 78421)** |
| **swyner@specialedlaw.org** | **mtiffany@tiffanylawgroup.com** |
| **Wyner Law Group, PC** | **Tiffany Law Group, P.C.** |
| **20655 S. Western Avenue** | **23670 Hawthorne Boulevard** |
| **Suite 105** | **Suite 204** |
| **Torrance, CA 90501** | **Torrance, CA 90505** |
| **Tel: (310) 961-2877** | **Tel: (424)247-8250 ext. 304** |

## TABLE OF CONTENTS

INTRODUCTION.....................................................................................................1

**1.** Appellants ask that the panel reconsider holding that the "but-for" test applies to retaliation claims involving the statutes at issue in this case, which has not been briefed and which is not necessary to the holding.....................................2

**2.** Appellants also request the panel to reconsider its holding that the Brenneises have failed to make a sufficient prima facie showing of retaliation to avoid summary judgment. ...........................................................................................8

**3.** Appellants request that the panel modify and/or delete certain statements in the opinion on the grounds that they are not factually accurate............................11

**4.** Appellants request the panel to delete several sentences from the first full paragraph on page 36........................................................................................13

CERTFICATE OF COMPLIANCE .....................................................................17

CERTFICATE OF SERVICE.................................................................................17

## TABLE OF AUTHORITIES

### Cases

*Amanda J. v. Clark Co. Sch. Dist.,* 267 F.3d 877 (9th Cir. 2001) .............................6

*Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047 (9th Cir. 2012)....................................6

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ..........7

*Clovis Unified School Dist. v. California Office of Administrative Hearings,* 903 F.2d 635 (9th Cir.1990) ................................................................................14

*District of Columbia v. Vinyard*, 901 F. Supp. 2d 77 (D.D.C. 2012)......................14

*M.M. v. Lafayette Sch. Dist.*, 767 F.3d 842 (9th Cir. 2014) ......................................6

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ....................................2, 8

*Ollier v. Sweetwater Union High Sch.. Dist.*, 768 F.3d 843 (9th Cir. 2014)............8

*See School Committee of Town of Burlington, Mass. v. Department of Educ.     of Mass.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) ...........................14

*University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517(2013) .................................................................. 2, 3, 4

*Yanish v. Barber*, 232 F.2d 939 (9th Cir. 1956) .....................................................15

**Statutes**

29 U.S.C. § 794a ........................................................................................3

42 U.S.C. § 12117 ......................................................................................3

42 U.S.C. § 12133 ......................................................................................3

42 U.S.C. § 2000e–3(a)..............................................................................4

Title I of the Americans with Disabilities Act, 42 U.S.C. § 12117 ..........................1

Title II of the Americans with Disabilities Act, 42 U.S.C. § 12133................ 1, 3, 4

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d-2000d-7 ............ 1, 3, 4

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2000e-17 ........ passim

**Rules**

FRAP 40...................................................................................................1

## INTRODUCTION

Pursuant to Federal Rules of Appellate Procedure Rule 40 and Ninth Circuit Rule 40-1, appellants petition the panel to rehear and/or modify certain portions of this Court's decision in this case. In counsel's judgment, a petition for rehearing is warranted because several material points of fact and law were overlooked in the decision as follows:

- The opinion holds that the "but-for" causal standard applicable to retaliation claims in employment discrimination cases under Title VII of the Civil Rights Act of 1964 (CRA) and Title I of the Americans with Disabilities Act (ADA), also applies to retaliation claims involving discrimination in the provision of public services under Title II of the ADA and Section 504, without considering that the "remedies, procedures and rights" provided for in those sections are aligned with Title VI *not* Title VII. For this reason, the decision to affirm summary judgment on Count VII of the Second Amended Complaint should be reversed;

- The opinion overlooks material factual findings in the administrative decision that are controlling insofar as the administrative decision was affirmed by the district court and not appealed by the school district; and

1

- The opinion overlooks a material point of law with respect to a school district's obligation to comply with an administrative decision, even pending appeal.

**1.    Appellants ask that the panel reconsider holding that the "but-for" test applies to retaliation claims involving the statutes at issue in this case, which has not been briefed and which is not necessary to the holding.**

As the opinion notes, in order to make out a *prima facie* case of retaliation under the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff must show "(a) that he or she was engaged in protected activity, (b) that he or she suffered an adverse action, and (c) that there was a causal link between the two." Slip. Op. at 38.

Citing *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2528 (2013), the opinion states:

> Other circuit and district courts have applied *Nassar* to ADA retaliation claims, and we do as well. *See, e.g., Feist v. La., Dep't of Justice, Office of Att'y Gen.,* 730 F.3d 450, 454 (5th Cir.2013); *E.E.O.C. v. Ford Motor Co.,* 782 F.3d 753, 767 (6th Cir.2015) (en banc); *Staley v. Gruenberg,* 575 F. App'x 153, 155 (4th Cir.2014); *Gallagher v. San Diego Unified Port Dist.,* 14 F.Supp.3d. 1380, 1390–91 (S.D.Cal.2014). [Slip Op. at 38].

In *Nassar,* the Supreme Court, in a split decision, held that claims for retaliation under Title VII of the CRA, which deals with employment discrimination, should be analyzed under the "but-for causation" standard rather than the less stringent

2

"motivating factor" standard. Every case cited by the Court that applied *Nassar* to ADA retaliation claims involved claims that arose under Title I of the ADA, which also deals with employment discrimination and which expressly incorporates the enforcement provisions of Title VII.[1]

By contrast, the remedies for violations of, and retaliation under, Title II of the ADA, are governed by the remedies in Title VI of the CRA [2] which are different from the remedies provided for retaliation under Title VII. This complex interplay of the statutory provisions suggests the need for careful consideration before applying legal principles applicable to employment discrimination under Title VII to discrimination in the provision of public services under Title VI and Title II, much less Section 504 of the Rehabilitation Act. Counsel has been unable to locate any circuit cases that have applied the *Nassar* "but-for" test to a claim for

---

[1] See, 42 U.S.C. § 12117 (which refers to the Title VII "powers, remedies and procedures" in 42 U.S.C. §§ 2000e-4, 2000e-5, 2000e-6, 2000e-8, and 2000e-9).

[2] See, 42 U.S.C. § 12133, which refers to the "remedies, procedures and rights" in the Rehabilitation Act, 29 U.S.C. § 794a. The Rehabilitation Act, in turn, provides for different "remedies, procedures, and rights" for violations of Section 501 dealing with employment discrimination (see § 794a(a)(1), which doubles back to the Title VII remedies), than for violations of Section 504, dealing with discrimination in access to public services (see § 794a(a)(2), which incorporates the "remedies, procedures, and rights" applicable to violations of Title VI of the CRA).

retaliation under Title VI, Title II or Section 504. Thus, this appears to be a case of first impression not only in the Ninth Circuit, but in any circuit.

The issue of whether the "but-for" causation test should apply in the context of a Title II or Section 504 retaliation claims was not briefed either below or before this Court. Appellants believe that there are significant factors that militate against the application of the "but-for" standard in the context of a retaliation claim under these sections, particularly where the claim arises in the context of the Individuals with Disabilities Education Act. The Court should consider these factors before ruling on this issue.

In *Nassar*, the Court relied heavily on the fact that Title VII has its own express retaliation provision, 42 U.S.C. § 2000e–3(a), which makes it unlawful for an employer to take adverse employment action against an employee "because" of the employee's advocacy. The Court observed:

> If Title VII had likewise been phrased in broad and general terms, respondent's argument [in favor of the less stringent multi-factor test] might have more force. But that is not how Title VII was written, which makes it incorrect to infer that Congress meant anything other than what the text does say on the subject of retaliation. [133 S. Ct. at 2530].

By contrast, Title VI of the CRA differs from Title VII in that it *does not have an express provision regarding retaliation*. This difference in the way Congress addressed retaliation under Title VI versus Title VII would seem to leave

4

open the possibility that Congress did *not* intend the more stringent "but-for"

standard that is applicable to retaliation claims under Title VII, to apply to such

claims when they arise under Title VI.

The Supreme Court also emphasized the appropriateness of the "but-for"

causation standard in Title VII cases by noting its "central importance to the fair

and responsible allocation of resources in the judicial and litigation systems. This

is of particular significance because claims of retaliation are being made with ever-

increasing frequency." *Id.* at 2531. The Court expressed concern that "lessening

the causation standard could also contribute to the filing of frivolous claims, which

would siphon resources from efforts by employer, administrative agencies, and

courts to combat." *Id.*. To illustrate, the Court gave the example of an employee

who is about to be fired for poor performance.

> [T]he employee might be tempted to make an unfounded charge of
> racial, sexual, or religious discrimination; then, when the unrelated
> employment action comes, the employee could allege that it is
> retaliation. If respondent were to prevail in his argument here, that
> claim could be established by a lessened causation standard, all in
> order to prevent the undesired change in employment circumstances.
> [Id. at 2532]

The relationship between employer and employee is fundamentally different

from that between a school district and the parent of a student with a disability. As

this Court has repeatedly emphasized, parental involvement and advocacy is a

fundamental precept of the IDEA: "A core principle throughout the IDEA is

5

meaningful participation by parents and informed parental consent, making the

parents an integral part of the team that determines both whether the child is a child

with a disability and the content of the child's IEP." *M.M. v. Lafayette Sch. Dist.*,

767 F.3d 842, 851 (9th Cir. 2014).  Similarly, in *Anchorage Sch. Dist. v. M.P.*, 689

F.3d 1047 (9th Cir. 2012) this Court stated:

> the IDEA, its implementing regulations, and our case law all
> emphasize the importance of parental involvement and advocacy,
> even when the parents' preferences do not align with those of the
> educational agency. The statute is particularly protective of parents'
> right to participate in the formulation of their child's IEP because
> "[p]arents not only represent the best interests of their child in the IEP
> development process, they also provide information about the child
> critical to developing a comprehensive IEP and which only they are in
> a position to know." [*quoting Amanda J. v. Clark Co. Sch. Dist.,* 267
> F.3d 877, 882 (9th Cir. 2001].

Additionally, unlike employers, school districts have an affirmative

responsibility to students with disabilities insofar as they are required to provide

them with a free appropriate public education. Thus, it is singularly inappropriate

for retaliation to *ever* be a factor in a school district's decision as to a student's

educational program. Yet that is exactly what the application of the stringent "but-

for" requirement in this context would permit.

It would also send a chilling message to parents that they had better be

careful when advocating for their disabled children lest they antagonize a school

administrator who will be free to retaliate by reducing services, changing service

6

providers, assigning less qualified staff, or taking any number of other discretionary actions entrusted to school administrators. Under the "but-for" standard, the administrator could engage in such conduct with impunity, secure in the knowledge that the parents have no recourse, even if they can prove that retaliation was a significant motivating factor.

This is a complex issue that deserves a reasoned and considered resolution by the first appellate court to consider it. Nor is there any need for this Court to make a determination as to which causal standard applies to claims for retaliation under the IDEA at this stage of the proceedings. As discussed below, this is true whether or not the panel reverses its affirmance of summary judgment on the retaliation claim in this case. Should it become necessary to decide the issue, it would be preferable for the parties to brief it before the district court in the first instance. *See*, *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 572-73 (1993) (Souter, J., concurring in part and concurring in the judgment) (counseling appellate courts against deciding "a rule of law unnecessary to the outcome of a case, especially one not put into play by the parties").

**2.    Appellants also request the panel to reconsider its holding that the Brenneises have failed to make a sufficient prima facie showing of retaliation to avoid summary judgment.**

As noted above, establishing a *prima facie* case of retaliation under the *McDonnell Douglas* burden-shifting standard requires a showing that the plaintiff 1) has engaged in statutorily protected expression; 2) has suffered an adverse action; and 3) there is a causal link between the protected expression and the adverse action.  As this Court observed in *Ollier v. Sweetwater Union High Sch.. Dist.*, 768 F.3d 843, 867-869 (9th Cir. 2014), "[t]he burden on a plaintiff to show a *prima facie* case of retaliation is low" and can normally be inferred from the "proximity in time between the protected action and the allegedly retaliatory conduct."

In this case, appellants established that less than two months after the ALJ issued her decision, while the school district was still trying to persuade the ALJ to "clarify" her decision, and before the December 2006 IEP, as modified by the ALJ's order, could be implemented, the school district developed a new IEP that proposed exactly the same type of services for T.B.'s g-tube feeding that the ALJ had just found inadequate and unsafe, and then filed another due process case seeking to re-litigate the issue of whether a BSA was qualified to provide the g-tube feedings. Mrs. Brenneise then made two appearances before the school board in public meetings where she criticized the school district's Director of Special

8

Education for failing to timely implement the ALJ's decision. The Director responded by sending Mrs. Brenneise a letter in which she conditioned T.B's return to school on Mrs. Brenneise's consent to the new proposed IEP.[3]

Because the Brenneises have established a prima facie case of retaliation based on temporal proximity, the burden should shift to the school district "to articulate some legitimate, nondiscriminatory reason" for its adverse actions. Although the panel suggests that "there were many plausible explanations why the district may have failed to provide a nurse, SEHT or SET" (Slip Op. at 39), the panel has also acknowledged that:

> A reasonable jury might find that the district was being deliberately indifferent to T.B.'s rights under California law—as opposed to merely negligent or wrong—by refusing to specify that a nurse, SEHT, or SET should carry out the g-tube feedings when the ALJ had suggested strongly that this was the only way in which the district could fulfill its legal duties. [Slip Op. at 35]

Appellants maintain that if a reasonable jury were to conclude that the school district was deliberately indifferent to T.B.'s civil rights when it developed the new IEP, a reasonable jury could similarly conclude that whatever justification the school district might proffer for defying the ALJ's decision was a mere pretext,

---

[3] By insisting that Mrs. Brenneise consent to the new IEP as a condition for T.B. returning to school, the letter violated T.B's right to implement the previous IEP as amended by the ALJ, as his stay put placement, and made it clear to Mrs.

*footnote continued on next page*

so that appellants would prevail on their retaliation claim even under the but-for standard. Thus, in the context of this case, it may make no difference which causal standard is applicable.

Of course if the panel is still not persuaded that the Brenneises have made a sufficient prima facie showing of retaliation to warrant shifting the burden back to the school district, then it does not matter which causal standard applies. But even if it does become necessary at some future point in the litigation to resolve the causal standard issue, it would be advisable for this Court to refrain from addressing the question at this time so as to allow the parties to brief the issue in the district court in the first instance.

Accordingly, appellants request this court to reverse the grant of summary judgment as to Count VII and remand for further proceedings in the district court, including a determination of the appropriate causal standard should it become necessary to decide that issue in this case.

_footnote continued from previous page_
Brenneise that the school district had so much animus towards her, that it would never give up fighting, no matter how many times she prevailed in due process.

**3. Appellants request that the panel modify and/or delete certain statements in the opinion on the grounds that they are not factually accurate.**

Footnote 4 states as follows:

Although the Brenneises consistently claim that they only sought for T.B. to be able to attend school safely, they do not assert that, in the absence of the California regulations, the district's plans for T.B.'s g-tube feeding were unreasonable. [Slip Op. at 28, n.4].

Although it is true that the focus *on appeal* was the failure to comply with the California regulations, the Brenneises did not concede that the school's proposal for accommodating T.B.'s g-tube feedings was either reasonable or safe. The point was not relevant to the issues on appeal, but was clearly asserted below.

In the administrative proceeding, the Brenneises maintained that the school district's proposal to have a behavioral aide provide T.B.'s g-tube feedings was neither reasonable nor safe. The ALJ ruled in favor of the Brenneises on this issue, rejecting the testimony of Dr. Taras that "[f]rom a medical point of view, it does not matter if an employee providing the G-Tube feeding is classified as a Behavior Support Assistant or Special Education Health Technician." ER at 103. The ALJ stated:

Despite Dr. Taras' testimony, the evidence does not support a finding that the behavioral aide should assist with the G-Tube feeding. Howarth, the supervisor for the behavioral aides, testified that he does not handle health matters. The District's own job classifications do not state that behavioral aides will assist with health functions. If Dr. Taras is correct that any District employee can perform G-Tube feedings, why have two special job classifications which are

11

authorized to perform this function? *A G-Tube procedure is an invasive medical procedure with possible complications.* The District has not met its burden of proving that a behavioral aide was qualified to assist Student with his G-Tube feeding *without the physical presence of the school nurse to oversee the process*. [ER at 103-104 (emphasis added)].

Appellants thus request that footnote 4 be deleted because it unfairly suggests that the Brenneises were quibbling about a technicality rather than pursuing a genuine concern about safety.

Appellants also request that the panel delete the first full sentence on page 33 which states: "About the time of the IEP meetings in this case, at least one other student in the school district was being assisted by a BSA in his g-tube feeding." This statement is inaccurate in suggesting that another student was being assisted by a BSA outside the physical presence of a nurse, which was not the case.

The court may have picked up this supposed "fact" from the declaration of Matthew Howarth, who was the supervisor of the BSAs, which the school district submitted in support of its motion for summary judgment:

21. During the time I was involved in T.B.'s case, I am aware of at least one other student who received assistance from their BSA, with their g-tube feedings during the school day (following training by, and under the supervision of a nurse). [ER-0335 (Filed Under Seal)]. Through artful wording, this declaration suggests that the BSA was alone

while assisting the student. But, Mr. Howarth's testimony at the administrative hearing makes clear that this was not the case.

12

Mr. Howarth testified that the nurse, not the BSA, was responsible for g-tube feedings. He testified that the nurse would be physically present to assist the student and "direct the feeding" "every single day." The BSA's role, "if they're there" would be to "assist the nurse" presumably with behavioral support. [ER-0758-0761; 0758-0759 (Filed Under Seal)]. The school district presented no evidence that any other student was being assisted by a BSA without a nurse being physically present.

**4. Appellants request the panel to delete several sentences from the first full paragraph on page 36.**

With respect to this Court's holding as to Count V, appellant respectfully requests that the Court amend its opinion to modify the following language that appears on page 36 of the opinion:

> A fact finder could also conclude, to the contrary, that the district was simply negligent, not deliberately indifferent, in interpreting the ALJ's instructions. The ALJ held that "[n]othing in this Decision is intended to prevent the District from proposing, in a future IEP, that another classification of employee assist [T.B.] with the feedings, provided that the assistant meets the requirements of Education Code section 49423.5. The district may simply have failed to pay enough attention to the final clause. Alternatively, it may have had a good-faith belief that the ALJ was wrong in her construction of California law and sincerely believed that it was not violating T.B.'s rights by failing to provide a nurse, SEHT, or SET to provide g-tube feedings. [Slip Op. at 36].

13

The suggestion that a school district can simply ignore an ALJ's decision based on a "good-faith belief" that the ALJ got it wrong—no matter how "sincere"— is contrary to well established precedent.

The law is clear that an administrative decision in favor of a parent must be immediately implemented by the school district, even while an appeal of that decision is pending. *See School Committee of Town of Burlington, Mass. v. Department of Educ. of Mass.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) (administrative decision in favor of the parents "would seem to constitute agreement by the State to the change of placement"); *Clovis Unified School Dist. v. California Office of Administrative Hearings,* 903 F.2d 635, 641 (9th Cir.1990) (explaining that "stay put" provision will not be interpreted in a manner "that would force parents to leave a child in what they feel may be an inappropriate educational placement . . . after a successful administrative ruling").  Thus, where a school district does not want to implement an administrative decision, courts have required the school district to seek a stay subject to the same standards applicable to a stay of any other court decision. *E.g., District of Columbia v. Vinyard*, 901 F. Supp. 2d 77 (D.D.C. 2012).

Thus, even though the school district had appealed the ALJ's decision in this case, it was obligated to comply with it.  As this court stated in *Yanish v. Barber*, 232 F.2d 939 (9th Cir. 1956):

14

Public officials "should . . . always scrupulously . . . observe and obey all orders of the court. A law-abiding attitude specially becomes prosecutors and government agents . . .," ". . .It is settled law that unless an injunction is void its propriety must be tested by appeal and not by disobedience."

In this case, the ALJ ordered the school district to provide a school nurse to assist T.B. with his G-Tube feedings. Although the ALJ noted that the school district could propose "another classification of employee" to assist with the feedings in a future IEP, it could only do so "*provided that the assistant meets the requirements of Education Code section 49423.5*" ER at 123 (emphasis added). Whether or not the school district "sincerely believed" that the ALJ was wrong, it was obligated to comply.

The Court's suggestion that the school district might also be justified in failing to comply with the ALJ's decision because it failed to "pay enough attention" to the language is similarly troubling. Although the failure to read a court decision carefully would certainly constitute negligence, it is unclear why a careless reading of a legal decision—any more than the careless reading of a statute—would be sufficient to excuse a school district from liability for denying a disabled student's civil rights.

Dated: August 14, 2015                              Respectfully submitted,

15

Tiffany Law Group, P.C.          Wyner Law Group, PC
By:  /S/  Marcy Tiffany         By:  /S/  Steven Wyner

Attorneys for Plaintiffs-Appellants

# CERTIFICATE OF COMPLIANCE

## Pursuant to Circuit Rules 35-4 and 40-1

I certify that pursuant to Circuit rule 35-4 or 40-1, the attached petition for panel rehearing is proportionately spaced, as a typeface of 14 points or more and contains 3,664 words (petitions and answers must not exceed 4,200 words). .

/s/ *Marcy Tiffany*

_____

Marcy Tiffany

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 14, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system

/s/ *Marcy Tiffany*

_____

Marcy Tiffany

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| T.B., a minor, by and through his Guardian ad Litem; ALLISON BRENNEISE; ROBERT BRENNEISE, *Plaintiffs-Appellants*, | No. 12-56060 <br><br> D.C. No. 3:08-cv-00028-MMA-WMC |
| STEVEN WYNER; WYNER AND TIFFANY, *Appellants*, | OPINION |
| v. | |
| SAN DIEGO UNIFIED SCHOOL DISTRICT, *Defendant-Appellee*. | |

Appeal from the United States District Court
for the Southern District of California
Michael M. Anello, District Judge, Presiding

Argued and Submitted
July 9, 2014—Pasadena, California

Filed July 31, 2015

Before: Raymond C. Fisher and Richard R. Clifton,
Circuit Judges, and Lee H. Rosenthal, District Judge.[*]

Opinion by Judge Clifton

---

## SUMMARY[**]

---

### Individuals with Disabilities Education Act / Americans with Disabilities Act / Rehabilitation Act

The panel affirmed in part and reversed in part the district court's summary judgment on claims under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act and vacated the district court's determination of attorneys' fees and costs under the Individuals with Disabilities Education Act in an action brought against a school district by a disabled student and his parents.

The district court upheld an administrative law judge's ruling that the school district denied the student a free appropriate public education in the least restrictive environment, as he was guaranteed under the IDEA, by failing to provide him with a legally adequate way to receive gastrostomy-tube feedings.

---

[*] The Honorable Lee H. Rosenthal, United States District Judge for the Southern District of Texas, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The plaintiffs argued that the school district was automatically deliberately indifferent to the student's rights, and therefore also liable for damages under Section 504 and the ADA, by failing to abide by California law on g-tube feedings. The panel agreed that California law established federally enforceable rights governing g-tube feeding in schools, but it held that the plaintiffs also must show intentional discrimination. The panel affirmed the district court's summary judgment in favor of the school district on Count IV, which concerned a 2006-07 individualized education program. The panel reversed on Count V, which concerned a 2007-08 IEP, and remanded for further proceedings, because there was a genuine dispute of material fact as to whether the school district was deliberately indifferent to the student's right to be assisted by a person qualified under California law.

The panel affirmed the district court's summary judgment in favor of the school district on a claim that the district retaliated against the student and his mother, in violation of the ADA, for her "aggressive advocacy" on his behalf. Following other circuits, the panel applied the but-for causation test of *Univ. of Tex. Sw. Med. Ctr.v. Nassar*, 133 S. Ct. 2517 (2013), and concluded that the plaintiffs failed to make out a prima facie case of retaliation.

Vacating the district court's award of substantially less than the amount of attorneys' fees requested by the plaintiffs under the IDEA, the panel concluded that the student's parents were substantially justified in rejecting a settlement offer because the relief obtained through the ALJ's decision was more favorable to the parents than the offer of settlement. In addition, the district court abused its discretion in concluding that the fee claim was unreasonable. For these

4          T.B. v. San Diego Unified Sch. Dist.

and other reasons, the panel vacated the district court's determination of fees and costs and remanded for reconsideration.

## COUNSEL

Steven Wyner, Wyner Law Group, PC, Torrance, California; Marcy J.K. Tiffany (argued), Tiffany Law Group, PC, Torrance, California, for Plaintiffs-Appellants.

Amy R. Levine, Sarah L.W. Sutherland (argued), William B. Tunick, Dannis Woliver Kelley, San Francisco, California, for Defendant-Appellee.

Maureen R. Graves, Daniel R. Shaw, Irvine, California, as and for Amicus Curiae California Association for Parent-Child Advocacy.

Harvey Saferstein, Nada I. Shamonki, Abigail V. O'Brient, Mintz Levin Cohn Ferris Glovsky & Popeo, P.C., Los Angeles, California; Paula D. Pearlman, Los Angeles, California, for Amici Curiae Disability Rights Legal Center and Learning Rights Law Center.

Jonathan P. Read, Tiffany M. Santos, Susan B. Winkelman, Fagen Friedman & Fulfrost, LLP, San Marcos, California, for Amicus Curiae California School Boards Association's Educational Legal Alliance.

Donald Davis, Damara Moore, San Francisco, California, as and for Amicus Curiae San Francisco Unified School District.

**OPINION**

CLIFTON, Circuit Judge:

This is the latest round in an unfortunate dispute that has endured for almost a decade regarding the education of a child with disabilities. The child is now 21 years old and has since graduated from high school, but the litigation has continued. T.B. and his parents, the Brenneises, used to be residents of the San Diego Unified School District. T.B. has learning and motor disabilities and feeds himself in part through a gastrostomy tube ("g-tube"). In 2006, the Brenneises and the district began working on an individualized education plan ("IEP") that would allow T.B., who was then being educated outside the public school system, to reenter school for the 2006–07 academic year. The two sides could not agree, however, and both filed for a due process hearing under the Individuals with Disabilities in Education Act ("IDEA").

The administrative law judge ("ALJ") who presided over that hearing ruled in favor of the school district on most issues but held that the district's proposed IEP was inadequate because it did not provide a legally adequate way for T.B. to receive g-tube feedings. That ruling was upheld on appeal to the district court. Neither side has further pursued that subject on appeal to this court.

The Brenneises also brought in district court a claim that the school district had violated T.B.'s civil rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. The district court granted summary judgment to the school district on those civil rights claims. We affirm that

6          T.B. v. San Diego Unified Sch. Dist.

summary judgment as to two counts but reverse it as to a third count.  We remand that claim for further proceedings.

In addition, the Brenneises and their attorneys sought attorneys' fees and costs for their partial victory before the ALJ.  The district court awarded them approximately $50,000 for attorneys' fees, substantially less than the $1.4 million that was requested.  The principal basis for denying most of the fee request was a determination by the district court that the Brenneises had unreasonably rejected a settlement offer made by the school district shortly before the start of the due process hearing.  The IDEA provides that attorneys' fees should not be awarded if the parents do not accept a timely settlement offer, "the relief finally obtained by the parents is not more favorable to the parents than the offer of settlement," and the parents' rejection of the settlement offer was not "substantially justified."   20 U.S.C. § 1415(i)(3)(D)(i)(III), (E).  We conclude, contrary to the district court, that the relief obtained through the ALJ's decision was more favorable to the parents than the offer of settlement and that the parents were substantially justified in rejecting the offer, so the district court's denial of fees on that basis must be set aside.  For that and other reasons, we vacate the district court's determination of fees and costs and remand that matter for further consideration as well.

## I.  Background

T.B. was born in January 1994.   He suffers from phenylketonuria, which prevents him from processing phenylalanine, an amino acid.  Infants are screened for phenylketonuria at birth, but because of a lab error, T.B. was not correctly diagnosed until he was three.  As a result, he suffered brain damage and physical problems.  Children with

phenylketonuria are given a phenylalanine-free drink based on formula; in 1997, T.B. was fitted with a g-tube through which the drink could be poured directly into his stomach.

### A. T.B.'s home education

In 2003, a dispute arose between T.B.'s mother, Alison Brenneise, and the school district about his education, and she withdrew him from school. From 2003 to 2006, T.B. was educated by external service providers, funded by the school district, and by Mrs. Brenneise herself, who was not paid. This program sometimes took place in the Brenneises' garage and was informally called "garage school," a term which we will also use. Under the terms of a settlement agreement, the school district funded 40 hours of services per week for T.B.

That settlement did not prevent further disputes. In May 2006, the Brenneises filed for a due process hearing, contending that the district had failed to provide T.B. with a free appropriate public education ("FAPE") for the years 2003–06, as required under the IDEA.[1] *See generally Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176 (1982) (discussing the requirements

---

[1] There are two mechanisms for resolving special education disputes. The first is to seek a due process hearing before a hearing officer. The hearing officer's decision may be appealed, directly or indirectly, to a federal district court. *See* 20 U.S.C. § 1415; *Porter v. Bd. of Trs. of Manhattan Beach Unified Sch. Dist.*, 307 F.3d 1064, 1066–67 (9th Cir. 2002). Second, either side may use a state's complaint resolution procedure. Each state is required, under regulations promulgated pursuant to the IDEA, to provide a formal means for resolving disputes outside of a due process hearing. *See* 34 C.F.R. § 300.151; *Porter*, 307 F.3d at 1066–67. Filing a compliance complaint is the way to activate California's complaint resolution procedure.

of a FAPE under the Education for All Handicapped Children Act of 1975, Pub. L. No. 94–142, 89 Stat. 773, the predecessor of the IDEA).  This case eventually settled.

Under the IDEA, the school district was required to evaluate T.B.'s educational needs at least once every three years.  20 U.S.C. § 1414(a)(2)(B)(ii).  In July 2006, the district produced an assessment report, and a few days later the parties agreed on an "extended school year" IEP that would cover the summer period.  This IEP placed T.B. in Coronado Academy, a public school outside the district, for eleven half-days, which was all that remained of the school year.  At that point, the IEP provided that T.B. would return to garage school.  Garage school also represented the "stay-put" schooling arrangement—how T.B. would be educated if the parties were unable to agree on an IEP for the 2006–07 school year.  *See* 20 U.S.C. § 1415(j); *Honig v. Doe*, 484 U.S. 305, 312 (1988).  After T.B. had attended Coronado for only five days, however, Coronado asked him to leave, so T.B. returned to garage school early.

### B.  *The compliance complaint and due process filings*

Mrs. Brenneise then filed a compliance complaint against the school district.  The California Department of Education upheld the complaint and ordered compensatory education as a remedy.  The amount of fees due to T.B.'s lawyers in connection with this compliance complaint is one of the issues in this appeal.

Immediately after T.B. returned to garage school, the school district attempted to create a new IEP for the 2006–07 school year.  At the end of August, the district provided a new draft IEP and a transition plan to facilitate his return to

school.  The district proposed that T.B. would be placed at Sierra Academy, which served only disabled students.  Mrs. Brenneise did not want T.B. to attend Sierra, in part because it did not have a nurse's office where he could lie down after g-tube feedings.  She did not agree to the August 2006 IEP and objected to "all areas" of the assessments on which the IEP was based.

Between September and December, the district worked on revising the IEP.  Because Mrs. Brenneise disagreed with assessments of T.B. that the district had made in June and July, she requested independent educational evaluations.  The district denied some of those requests and, in November 2006, filed for a due process hearing to defend its assessments.

In December 2006, the district prepared a new IEP under which T.B. would be placed at Wangenheim Middle School. In accordance with Mrs. Brenneise's request, this was a comprehensive school within and operated by the school district.  Unlike Sierra, Wangenheim had a nurse's office. The December IEP was otherwise largely similar to the August IEP.  Mrs. Brenneise did not consent to the December IEP.  In December 2006, the school district again filed for a due process hearing, arguing that the IEP "offer[ed] Student a FAPE designed to meet his unique needs and allow him to benefit from his education."  In January 2007, the Brenneises also filed for a due process hearing, contending that the school district had denied T.B. a FAPE.  This case was consolidated with the previously pending cases.

### C. Settlement proposals

From February to May 2007, the parties engaged in settlement discussions. The Brenneises were represented by Steven Wyner and his law firm, Wyner and Tiffany. Although some of the discussions were oral and the parties have not stipulated as to their content, it is undisputed that the two sides discussed the possibility of an arrangement under which the school district might pay the Brenneises an annual sum in return for the Brenneises' commitment to take over responsibility for T.B.'s education from the district and to have T.B. educated outside the public school system.

According to the district, the Brenneises requested $200,000 per year to have T.B. educated privately. The Brenneises and Wyner have not denied this. In March 2007, the school district offered to pay the Brenneises $75,000 per year to have T.B. educated privately until he reached the age of 18, in the 2011–12 school year. According to the district, this was considerably more than the $30,000 to $55,000 that it would cost to educate T.B. in private school, but far less than the cost of the existing garage school program, which was approximately $157,000. The district also stated that it was rejecting the Brenneises' demand of $200,000 per year to educate T.B. privately. The Brenneises rejected the $75,000 offer.

In April 2007, the school district offered the Brenneises a one-time payment of $50,000 to settle all of the due process claims T.B. had brought relating to the August and December IEPs. The school district stated that the prior $75,000 offer was "supersede[d]." The record does not contain any evidence of a response to this offer.

In May 2007, the district sent Wyner a new long-term settlement proposal. This offer, described in more detail below, was for $150,000 per year. It permitted the Brenneises to reenroll T.B. in public school beginning with the 2009–10 school year. The agreement was to be effective immediately; the Brenneises would receive a pro-rated share of the $150,000 for the 2006–07 school year. If T.B. was subsequently enrolled in public school, and the Brenneises were unhappy with that program, the stay-put arrangement while the dispute was resolved would be the public school program.

Wyner, the attorney for the Brenneises, rejected the offer later the same day on the ground that it was "still far short of the demand that I communicated to you." As a counteroffer, he requested an annual payment of $250,000, a larger figure than previously sought. The counteroffer provided that T.B. would remain in garage school for the rest of the 2006–07 school year, be educated privately for the 2007–08 school year, and have the right to reenroll in public school any year thereafter. The stay-put arrangement under the counteroffer was garage school. The district did not accept that offer; the record does not contain any response to the district's rejection.

### D. The due process hearing and decision

The case proceeded to the due process hearing, which began on May 14, 2007. The administrative law judge addressed eighteen issues, two raised by the district in its filings and sixteen raised by the Brenneises. There was overlap in some of the issues raised by the parties.

After a 27-day hearing and written closing arguments, the ALJ in October 2007 handed down a careful and thorough 75-page written decision that found in favor of the school district on 15 issues. The Brenneises won on the remaining three: Issues 10, 14, and 15. Issue 10, raised by the district, was whether the district's education would provide T.B. "a FAPE designed to meet his unique needs and allow him to benefit from his education." The other two issues were raised by the Brenneises: Issue 14 was whether the district had denied T.B. a FAPE by failing to develop a health care plan that would "enable [T.B.] to attend school safely," and Issue 15 was whether the district had denied T.B. a FAPE by failing to develop an appropriate transition plan. Issue 10 overlapped with Issues 14 and 15, so we do not discuss it separately.

### 1. Issue 14: the g-tube feeding

The first of the two discrete issues on which T.B. won centered around his g-tube feeding. The IDEA sets out minimum federal standards for school districts that receive federal funding. States may choose to supplement the federal standards with their own, and "[s]tate standards that are not inconsistent with federal standards are also enforceable in federal court." *W.G. v. Bd. of Trustees of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1483 (9th Cir. 1992). Here, the ALJ ruled that the school district had failed to show that its plan met the minimum standards that California had set relating to g-tube feeding to complement the federal standards.

To understand the basis for the ALJ's decision, it is necessary to review in some detail the relevant federal and state requirements. The IDEA provides that an IEP shall

contain a "statement of the special education and related services" that will be provided to a child.  20 U.S.C. § 1414(d)(1)(A)(i)(IV).  These related services are defined at § 1401(26) as a range of items including "school nurse services designed to enable a child with a disability to receive a free appropriate public education."  California has adopted a similar definition of related services, called "designated instruction and services."  Cal. Educ. Code § 56363(a). Designated instruction and services include "[h]ealth and nursing services," *id.* § 56363(b)(12).  These may in turn include "specialized physical health care services," 5 Cal. Code Regs. § 3051.12(b), which are defined as "those health services prescribed by the child's licensed physician and surgeon requiring medically related training for the individual who performs the services and which are necessary during the school day to enable the child to attend school."  Under the Code of Regulations, "[s]pecific continuing specialized physical health care services required in order for the individual to benefit from special education *will be included* in the [IEP]."  *Id.* § 3051.12(b)(3)(A) (emphasis added).

The ALJ held that T.B.'s g-tube feeding, "if required to be performed during the school day by District personnel," was a specialized physical health care service.  Therefore, it had to be described in the IEP.  But the August 2006 IEP did not "describe general procedures for G-Tube feeding, where that procedure would take place on the Sierra campus, or identify the category of employee who would assist [T.B.] with the feedings."  Rather, the IEP simply recited that T.B. would receive three hours of nursing services in September 2006 and "5 hours consultation per year as needed," and contained a "School Health Management Plan," which required adult supervision of T.B.'s g-tube feedings.  The transition plan section of the IEP stated that the nurse would

train Sierra staff in g-tube feeding before T.B. started school but provided no further details. Therefore, the ALJ concluded, the August 2006 IEP did not provide a FAPE.

The December 2006 IEP also failed to provide a FAPE. Like the August IEP, this plan provided for a total of eight hours of nursing services throughout the school year and also contained the health management plan. Unlike the August IEP, the December IEP contained two extra pages explaining how food was to be prepared at school and stating that "[T.B.] requires an Individualized School Healthcare Plan." These pages also referred to the transition plan, which was more detailed than the August version. The transition plan provided that all school staff would be trained in T.B.'s dietary requirements, and that g-tube feeding would take place in the nurse's office, with the staff member assisting T.B. "[t]o be determined in collaboration with the school nurse and parent."

The ALJ ruled that this was insufficient. The district was not permitted to rely on the creation of an Individualized School Healthcare Plan after the event: the IEP itself had to be sufficiently clear. And the December IEP "did not specify which category of District staff would be responsible for the G-Tube feeding."

This failure to specify was important under California law. Under Education Code § 49423.5(a), only two types of persons were allowed to perform specialized physical education services such as g-tube feeding: "(1) Qualified persons who possess an appropriate credential . . . [and] (2) [q]ualified designated school personnel trained in the administration of specialized physical health care if they perform those services under the supervision . . . of a

credentialed school nurse, public health nurse, or licensed physician . . . ." The ALJ found that a school nurse would be considered in the former category. But a person could be considered "qualified designated school personnel" only if he or she had received "[m]edically related training" in "standardized procedures provided by a qualified school nurse, qualified public health nurse, qualified licensed physician and surgeon, or other approved programs." 5 Cal. Code Regs. § 3051.12(b)(1)(E)(2).

The ALJ found that the district had two job categories that were intended to cover qualified designated school personnel: Special Education Technician ("SET") and Special Education Health Technician ("SEHT"). The district's job classification prescribed a wide range of duties for SETs, including "[p]erform[ing] specialized health care procedures under [the] direction of [a] school nurse." An SEHT's duties were more narrowly focused on health care, and specifically included g-tube feedings. An SEHT was more experienced than an SET: according to the job classification, an SEHT required "[a]ny combination of training, experience, and/or education equivalent to one year of experience in the district job class of . . . Special Education Technician." By contrast, the ALJ determined that the district provided insufficient evidence that a third job categorization, Behavioral Support Assistant ("BSA"), was qualified to provide g-tube feedings under California law. The district's job classification stated that BSAs should "[p]rovide individual or small group support to pupils according to established Individualized Education Programs" but did not specify any medical duties.

As the ALJ stated, the IEP was silent about who would be performing the g-tube feeding. There was evidence at the hearing that the feeding would, in fact, be done by a BSA,

16          T.B. v. San Diego Unified Sch. Dist.

who would be assigned to assist T.B. throughout the school
day. That was the problem. The district had not shown that
the BSA would be qualified to perform g-tube feedings, so
"[T.B.'s] parents had no way to be sure that an appropriate
employee would be assisting their child." As a result, the
ALJ concluded, the Brenneises prevailed on Issue 14.

2.  Issue 15: the transition plans

The second discrete issue on which the Brenneises
prevailed related to the transition plans. Under California
law, an IEP had to contain "[p]rovision for the transition into
the regular class program if the pupil is to be transferred from
a special class or nonpublic, nonsectarian school into a
regular class in a public school . . . ." Cal. Educ. Code
§ 56345(b)(4). This included "[a] description of activities
provided to integrate the pupil into the regular education
program" and "[a] description of the activities provided to
support the transition of pupils from the special education
program into the regular education program." *Id.*
§ 56345(b)(4)(A), (B). The ALJ concluded that the transition
plans in both the August and December IEPs were defective.

The August IEP transition plan purported to provide a
three-week transition into school. At the hearing, however,
the district's expert testified that the transition might take
more than three weeks, depending on T.B.'s progress.
Therefore, the language of the plan was "directly
contradictory" to the school district's evidence. Furthermore,
the plan did not state that designated instruction and services
would continue until transition was complete, nor who would
decide when T.B. was to move to the next phase. That made
the plan inadequate.

The December IEP transition plan, by contrast, explicitly provided for four flexible phases. But this plan was also flawed: T.B. could, in theory, remain in one phase of the plan for the entire year, and so the plan needed to state what T.B.'s services were in each phase. Like the August plan, it did not specify the designated instruction and services that T.B. would receive during the transition plan.

In addition, the parents were not included in the collaboration team that decided when T.B. would move from one phase to the next, a problem that affected both plans. The ALJ concluded this was a violation of federal law, which required that the child's parents must be involved in decisions relating to his education placement. *See, e.g.*, 34 C.F.R. § 300.327. Therefore, the Brenneises prevailed on Issue 15.

### 3. The relief

As relief, the ALJ modified the December IEP by including language to state that a school nurse would "personally assist" T.B. with his g-tube feeding, and that the feeding would occur "at the time(s) and in the manner designated in a doctor's order from the [T.B.'s] current physician." But the ALJ also said that

> nothing in this Decision is intended to prevent the District from proposing, in a future IEP, that another classification of employee assist [T.B.] with the feedings, provided that the assistant meets the requirements of Education Code section 49423.5. In addition, nothing in this Decision is intended to limit the classification of employee that may be designated pursuant to that code section. This

> Decision is simply based on the finding that,
> at the present time and in the present case, the
> District failed to make an evidentiary showing
> that the three hours of training provided for
> District staff in the December 4 IEP would
> qualify [T.B.'s] one-to-one behavioral aide to
> perform specialized physical health care
> services.

The December IEP was also modified to include Mrs. Brenneise as a participant in the collaboration meetings in the transition plan, and to clarify that "until [T.B.] reaches phase four of the transition plan, [T.B.'s] District-funded [designated instruction and] services will continue with his current . . . providers and at his current levels of service."

### E.  The district prepares new IEPs

The district sent Mrs. Brenneise a modified IEP in October 2007.  Like the December 2006 IEP, this IEP provided for eight hours of "health nursing."  It also spelled out how g-tube feeding would take place: "G-tube feeding will be scheduled to occur daily in the nurse's office.  A school nurse will be present and will personally assist the student with the student's G-tube feeding."  The district also added language stating that health training would be critical throughout the year, although it provided no more hours of training.  And the IEP identified T.B.'s then-current provider of occupational therapy as a service provider until T.B. transitioned into spending the full day at school.

Mrs. Brenneise rejected this IEP, apparently because it provided that T.B. would receive occupational therapy from the school T.B. was to attend, Wangenheim, not from the

current provider, which she preferred. The district moved to clarify the ALJ's decision on the ground that Mrs. Brenneise's preferred provider was not certified with the California Department of Education. The ALJ denied that request, in part because all the parties had agreed to fund T.B.'s current providers.

Nevertheless, the Brenneises and the district slowly began implementing the transition plan. The district also began creating an IEP for the 2007–08 school year. On November 29, 2007, the district held a meeting to adopt a new IEP. As relevant to this appeal, the IEP provided for health nursing services as follows:

> 3 hours consultation/training to be provided prior to [T.B.'s] starting school. 5 hours consultation per year as needed.

> G-tube feeding will be scheduled to occur as prescribed by MD twice daily in nurse's office—one time daily during Phases I–III of transition plan, then two times daily beginning in Phase IV when [T.B.] attends school full day. During first week of [T.B.'s] school attendance, a school nurse will be present and personally assist him with G-tube feeding. Following training by the school nurse, BSA staff will replace the school nurse as staff designated to be present and personally assist [T.B.] with G-tube feeding. School nurse will supervise BSAs, as well as train and supervise SEHT and SET to be designated back-up staff in case of BSA absence or emergency.

20          T.B. v. San Diego Unified Sch. Dist.

Mrs. Brenneise refused to agree to this IEP because it provided that a BSA, not a nurse, would be responsible for T.B.'s feedings. At a December 21, 2007 meeting to discuss the IEP, the district responded by offering to raise the nursing services from eight hours per year to twelve.

## F. Both sides appeal to district court

On January 4, 2008, the Brenneises filed a complaint in district court to appeal the ALJ's determinations on the fifteen issues on which they lost. The district filed its own district court appeal on the same day to challenge the ALJ's determinations on the three issues on which it lost. The district also sued Steven Wyner and his law firm personally to recover the district's fees for responding to frivolous claims. It also sought a declaration that it was not liable to pay the Brenneises' fees for their successful July 2006 compliance complaint.

At the end of January 2008, the district filed for another due process hearing, seeking a determination that the district had offered a FAPE for the 2007–08 school year. On February 22, 2008, MarySue Glynn, the district's Director of Special Education, wrote to Mrs. Brenneise that the district remained eager for T.B. to begin school and would start him immediately "if you would consent." Glynn asked Mrs. Brenneise to contact her if she was "interested in modifications to [T.B.'s] IEP which would allow him to transition more quickly." A week later, Mrs. Brenneise gave the district notice that T.B. and his family were moving out of state. The Brenneises did not pursue the due process hearing for the 2007–08 school year, but the litigation over the prior year lived on.

The Brenneises amended their district court complaint in March 2008, seeking, among other things, attorneys' fees relating to the July 2006 compliance complaint. In April, the court consolidated the cases filed by the Brenneises and the district. It denied Wyner's motion to dismiss the district's claim against Wyner and his law firm and denied the district's motion to dismiss the Brenneises' claim for fees for the compliance complaint. The school district appealed the denial of its motion to dismiss, but this court dismissed the appeal because there was no final judgment and the district had not been granted permission to appeal from the interlocutory ruling.

The Brenneises filed a Second Amended Complaint, the currently operative pleading, in May 2009. It contained the three surviving claims from the first amended complaint—appealing the ALJ's adverse rulings, and seeking attorneys' fees under the IDEA and in connection with the compliance complaint—and also four new civil rights claims under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132.

The school district moved for summary judgment on its first cause of action. In June 2010, the court denied this motion and upheld the ALJ's rulings in favor of the Brenneises on Issues 10, 14, and 15, praising the quality of the ALJ's analysis. The school district did not appeal this judgment, and it later abandoned its other two causes of action.

The Brenneises abandoned their claim challenging the ALJ's adverse rulings on the IEP. The court then invited the Brenneises to file their motion for attorneys' fees relating to

their victory in upholding the ALJ's three rulings in their favor. The parties stipulated to judgment in favor of the Brenneises on their claim for recovery for fees related to the July 2006 compliance complaint. (As we discuss below, this stipulation is still a source of dispute.)

In November 2011, the parties moved jointly to dismiss one of the Brenneises' civil rights claims. The Brenneises moved for summary judgment on one of the other claims, Count 4 of the complaint, in which they alleged that the district was deliberately indifferent to T.B.'s safety by failing to provide a qualified person to do the g-tube feedings. The district moved for summary judgment on all three of the remaining civil rights claims (Counts 4, 5, and 7).

### G. The district court awards the Brenneises reduced attorneys' fees

In March 2012, the district court ruled on the Brenneises' motion for attorneys' fees. The motion sought $1,398,048.70. The court held that the Brenneises were a "prevailing party" on the IDEA claims, because they had secured more than "merely technical" relief. In particular, the ALJ had found that the August and December 2006 IEPs failed to specify a "qualified person" to assist T.B. with his g-tube feedings, and the district court had upheld this finding. This was "an important issue of health and safety."

Having found that the Brenneises were entitled to fees, the court then moved to the amount. The IDEA prohibits attorneys' fees for services performed after a written settlement offer is made to the parents if (i) the offer is made more than ten days before the start of the due process hearing, (ii) the parents reject it, and (iii) the offer is at least as good

as the relief the parents secure in the hearing. 20 U.S.C. § 1415(i)(3)(D). However, as an exception to the foregoing rule, fees are available if the parents are "substantially justified" in rejecting the offer. 20 U.S.C. § 1415(i)(3)(E). Based on that provision, the district court ruled that the Brenneises were not entitled to any fees and costs incurred on and after May 4, 2007, when they rejected an offer made by the district in a letter from its attorney, dated May 3, 2007. The district court concluded that the Brenneises did not secure more favorable relief before the ALJ and were not substantially justified in rejecting the offer. The court went on to rule that "[e]ven if the IDEA's provision did not strictly apply to the facts, the Court, in its discretion, would not award the Brenneises any fees incurred after they unreasonably rejected the May 3, 2007, settlement offer."

The court ruled, however, that the Brenneises could recover reasonable fees and costs incurred before May 4, 2007, the date they rejected the district's offer. The court conducted a lodestar analysis and awarded attorneys' fees of $50,260.50, plus nontaxable costs of $5,173.41.

## H. *The district court grants summary judgment to the school district*

In May 2012, the court granted the school district summary judgment on the Brenneises' three outstanding civil rights claims. To establish a claim for damages under the Rehabilitation Act and ADA, a plaintiff must prove that the defendant intended to discriminate on the basis of his or her disability, or was deliberately indifferent to the disability. *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001). First, the court rejected the Brenneises' claim that the school district had been deliberately indifferent to T.B.'s need

for a qualified person to provide his g-tube feedings. It concluded that the district never ignored the Brenneises' concerns; it acted in good faith, and simply read the relevant California law differently from the Brenneises. Next, the court ruled that the school district had not violated T.B.'s civil rights by failing to implement the ALJ's decision. The ALJ had required that the 2006–07 IEP be amended to provide that a nurse do the g-tube feedings, but the decision had explicitly stated that the ALJ was not ruling on future IEPs, such as the December 2007 IEP. The district seemed to be acting in good faith by offering to increase nursing hours. Relatedly, there was no evidence to support the allegation that the school district had discriminated against T.B. by failing to provide him with occupational therapy from his preferred provider. Finally, the district court concluded, no reasonable jury could infer that the school district retaliated against the Brenneises. The district's IEP team wanted T.B. to return to school and "took great pains" to respond to Mrs. Brenneise's concerns.

The Brenneises and Wyner appealed both the summary judgment on the civil rights claims and the limited grant of attorneys' fees.[2] The school district has not filed a cross-

---

[2] In April 2012, the Brenneises filed a Rule 54(b) motion for the court to reconsider its ruling on attorneys' fees. They noticed their appeal in June 2012, after the court had issued its ruling on the motion for attorneys' fees and summary judgment, but while the motion for reconsideration was still pending. In July 2012, the court denied the Brenneises' motion under Rule 54(b) to reconsider the denial of the request for $1.4 million in attorneys' fees and costs.

The parties dispute whether the ruling on the Rule 54(b) motion is before the court. It is not. The motion did not toll the time for filing an appeal because the district court did not extend the time to appeal under

T.B. V. SAN DIEGO UNIFIED SCH. DIST.          25

appeal.

## II.  Standard of Review

"This court reviews a grant of summary judgment de novo." *Mark H. v. Hamamoto*, 620 F.3d 1090, 1096 (9th Cir. 2010).  "We must determine, viewing the evidence in the light most favorable to . . . the non-moving party, whether there are any genuine [disputes] of material fact and whether the district court correctly applied the substantive law." *Nigro v. Sears, Roebuck & Co.,* 784 F.3d 495, 495 (9th Cir. 2015) (quoting *Olsen v. Idaho Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004)); Fed. R. Civ. P. 56(a).  "A factual [dispute] is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

We review an award of attorneys' fees for abuse of discretion. *Shapiro ex rel. Shapiro v. Paradise Valley Unified Sch. Dist. No. 69*, 374 F.3d 857, 861 (9th Cir. 2004).  "The district court's underlying factual determinations are reviewed for clear error and its legal analysis relevant to the fee determination is reviewed de novo."  *Id.*  We discuss below in more detail the standard for reviewing the district court's decision to limit attorneys' fees under 20 U.S.C. § 1415(i)(3)(D).

---

Rule 58.  *See* Fed. R. App. P. 4(a)(4)(A)(iii).  Therefore, the Brenneises were required to file a separate appeal relating to this motion, which they did not.  *See id.* R. 4(a)(4)(B)(i); *Stone v. INS*, 514 U.S. 386, 403 (1995) ("[M]otions that do not toll the time for taking an appeal give rise to two separate appellate proceedings . . . .").  Nevertheless, our disposition of this case is not affected by the Brenneises' failure to appeal the decision on the Rule 54(b) motion.

## III.    The Civil Rights Claims

We affirm in part and reverse in part the grant of summary judgment on the three civil rights claims. In particular, we affirm the summary judgments in favor of the school district on Counts IV and VII of the Second Amended Complaint, but reverse the summary judgment on Count V and remand for further proceedings on that count.

### A.  Counts IV and V: the g-tube feeding

In Counts IV and V of the Second Amended Complaint, the Brenneises alleged that the school district violated the ADA and Section 504 of the Rehabilitation Act by failing to offer and implement a g-tube feeding regime that would enable T.B. to attend school safely. Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The language of the ADA is almost identical, and courts typically analyze the two provisions together.[3] *See Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002).

"Plaintiffs may establish that an organization [that receives federal funds, such as the district,] violated § 504 by showing that the public entity discriminated against,

---

[3] 42 U.S.C. § 12132 provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

excluded, or denied the benefits of a public program to a qualified person with a disability.  This includes showing that the public entity denied the plaintiff a reasonable accommodation."  *Mark H.*, 620 F.3d at 1096 (citation omitted).  If a plaintiff seeks monetary damages for a violation of Section 504 or the ADA, he must show that the defendant acted with intent to deny him the benefits of the public program or a reasonable accommodation.  *Duvall*, 260 F.3d at 1138.

### 1.  Statutory accommodations

Before we pass on the Brenneises' claims, we must address a threshold issue: whether a district's failure to abide by a statutorily mandated accommodation may give rise to a civil rights claim.  In the typical civil rights case arising out of an IDEA suit, the plaintiff alleges that the district failed to provide a "reasonable accommodation" to allow him to take advantage of the district's educational program.  *See, e.g.*, *Mark H.*, 620 F.3d at 1097–98.  When a court determines whether an accommodation is reasonable or not, each side may be required to produce evidence, and the ultimate question of reasonableness may have to be decided by a jury.  *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 816–17 (9th Cir. 1999).

This case is different, however.  The Brenneises allege that the school district denied T.B. a free appropriate public education in the "least restrictive environment," as he was guaranteed under the IDEA, by failing to provide him with a reasonable accommodation for his g-tube feeding.  *See* 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.114 *et seq.* The only reasonable accommodation, according to the Brenneises, is not one that may be determined by a court, but the one

prescribed by the California statute and regulations. They go on to argue that the school district was automatically deliberately indifferent to T.B.'s rights, and therefore liable for damages under Section 504 and the ADA, by failing to abide by California law.[4] The school district responds that there is no "per se" reasonable accommodation for g-tube feeding under California law and denies that it was deliberately indifferent to T.B.'s rights.

We agree with the Brenneises that California law establishes federally enforceable rights governing g-tube feeding in schools. In the absence of any specific regulations, the district would be required to make a reasonable accommodation to allow T.B. to receive g-tube feedings in school so that he could receive a free appropriate public education. The form of this accommodation would depend on the "individual circumstances of [the] case." *Vinson*, 288 F.3d at 1154. But when the State has specified the form that the accommodation must take, that specification establishes minimum standards to which the district must adhere.[5]

---

[4] Although the Brenneises consistently claim that they only sought for T.B. to be able to attend school safely, they do not assert that, in the absence of the California regulations, the district's plans for T.B.'s g-tube feeding were unreasonable.

[5] We say "minimum" advisedly. Of course, a state's law prescribing a mandatory reasonable accommodation may not be reasonable in all circumstances. It is possible that there could be situations where a student is so disabled that a statutory accommodation would be inadequate. In such a case, the district would not avoid its duties by pointing to the minimum statutory requirement. *See, e.g.*, *Quinones v. City of Evanston, Ill.*, 58 F.3d 275, 277 (7th Cir. 1995).

The service or program that T.B. claims he was prevented from receiving is a safe public education, not simply g-tube feedings from a nurse, SEHT, or SET. Even though T.B.'s failure to obtain an IEP that unambiguously provided for g-tube feedings in accordance with California law is the hook on which his civil rights claims depend (and the parties disagree as to how concerned the Brenneises were about this issue before they prevailed on it in the due process hearing), his fundamental complaint is that he has been prevented from attending public school safely. In California, g-tube feeding provisions are part of the overall educational program that the state provides to students; they are not a separate service. T.B.'s claim, then, is that he was deprived of his right to attend public school, in the manner required by California law, on account of his disability.

T.B.'s right to attend public school in a manner permitted by California law is enforceable in district court. As we observed earlier, state standards for a free appropriate public education "not inconsistent with federal standards are . . . enforceable in federal court." *Target Range*, 960 F.2d at 1483. "While a state may not depart downward from the minimum level of appropriateness mandated under federal law, a state is free to exceed, both substantively and procedurally, the protection and services to be provided to its disabled children." *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 987 (1st Cir. 1990) (internal quotation marks omitted). In setting forth who shall provide g-tube feedings, California appears to have gone beyond what a federal court might require in other circumstances, but that is a choice the legislature has made, and, like other choices regarding public

education for disabled children, it is enforceable in court.[6] We therefore agree with the only other court that, so far as we are aware, has analyzed this issue, and hold that where the State has defined an accommodation by law, that accommodation is enforceable in court. *See Sullivan ex rel. Sullivan v. Vallejo City Unified Sch. Dist.*, 731 F. Supp. 947, 959 (E.D. Cal. 1990) (holding that a reasonable accommodation is defined "at the minimum" by state law that prescribes mandatory accommodations for disabled persons). The reasonable accommodation that the school district was required to provide was the designation of a qualified employee to administer g-tube feedings: either an employee "possess[ing] an appropriate credential . . . [or a] [q]ualified designated school personnel trained in the administration of specialized physical health care if they perform those services under the supervision . . . of a credentialed school nurse, public health nurse, or licensed physician." Cal. Educ. Code § 49423.5(a).

Although we agree with the Brenneises that a school district's failure to abide by California's minimum standards

---

[6] Amici supporting the school district make other arguments why we should not rule that the state's statutory accommodation is enforceable. Amicus California School Boards Association submits that the ALJ misinterpreted Education Code § 49423.5(a), which provides that g-tube feeding "may" be provided by qualified individuals. This argument (if it was made at all) evidently failed to persuade the district court in its denial of the school district's appeal from the ALJ's ruling, and the district chose not to appeal that decision to this court. In any case, it is unconvincing. Amicus ignores the opening words of § 49423.5(a), "[n]otwithstanding Section 49422," which references a section that delineates stricter requirements for which health professionals may administer health services in the schools. In that context, the use of the term "may" in § 49423.5 appears to be intended to carve out a permissive exception to these more rigorous requirements.

on g-tube feeding may give rise to a civil rights claim, we reject their argument that a district's failure to provide these services means that they automatically prevail on such a claim. To succeed on a civil rights claim in this context, the plaintiffs must show intentional discrimination. *Duvall*, 260 F.3d at 1139. Deliberate indifference qualifies as intent, and the Brenneises attempt to meet this easier standard rather than showing animus on the part of the school district. Deliberate indifference is defined as "knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Id*.

The Brenneises meet the first part of the test, but not the second. "When the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test." *Duvall*, 260 F.3d at 1139. In this case, the school district was on notice that the personnel selected to administer g-tube feedings had to meet the requirements of California Education Code § 49423.5. The *Duvall* court went on to hold, however, that "in order to meet the second element of the deliberate indifference test, a failure to act must be more than negligent, and involves an element of deliberateness." *Id*. This defeats the Brenneises' argument that any failure to meet the state standard is per se deliberate indifference, which rests solely on the maxim "everyone is presumed to know the law." The Brenneises' approach would impermissibly convert the deliberate indifference standard into a strict liability standard. *See Ferguson v. City of Phoenix*, 157 F.3d 668, 673–75 (9th Cir. 1998). Therefore, the Brenneises must still prove that the school district was

deliberately indifferent to the need to meet state standards for
feeding T.B. at school.

### 2. Count IV: the 2006–07 IEP

With this in mind, we turn to Count IV of the Second
Amended Complaint. The Brenneises, citing the language of
Education Code § 49423.5(a), alleged that "[t]he District
failed and refused to offer to provide either a qualified person
or qualified designated trained school personnel to provide
[T.B.'s] G-Tube feedings." The district court upheld the
determination of the ALJ that the IEP did not specify that a
qualified person, as defined by statute, would perform the g-
tube feedings. But the district court also concluded that there
was no evidence that the district had been deliberately
indifferent to T.B.'s g-tube feeding. The school district, the
court held, "never ignored the Brenneises' concerns," but
engaged in detailed discussions about how to provide adult
supervision for the g-tube feedings. "[T]he School district
offered accommodations based upon its knowledge of T.B.'s
abilities, which allowed any trained adult to assist him with
the procedure."

We agree that no reasonable jury could find that the
district was deliberately indifferent to T.B.'s right to be
assisted by a person qualified under California law. The
school district was on constructive notice about the g-tube
feeding requirements, as they were laid down in the
California statute. *Duvall*, 260 F.3d at 1139. But there is no
evidence that the school district was deliberately indifferent
to this standard. The district believed that it could specify
who would assist T.B. in an Individualized School Healthcare
Plan. California's requirements are not spelled out with
precision: the most objective requirement is that the assistant

should demonstrate "competence in basic cardiopulmonary resuscitation." Cal. Educ. Code § 49423.5(C); 5 Cal. Code Regs. § 3051.12(b)(1)(C). About the time of the IEP meetings in this case, at least one other student in the school district was being assisted by a BSA in his g-tube feeding. A reasonable jury would be able to find, at most, that the district was wrong about the state's g-tube feeding requirements, not that it was deliberately indifferent.

The Brenneises try, and fail, to show that the school district was on notice that its plan to have a behavioral aide assist in g-tube feedings would not meet California's requirements by pointing to an unpublished Office of Administrative Hearings case involving the district, *Student v. San Diego Unified School District*, OAH No. 04-209 (May 25, 2004). In that case, the ALJ was required to decide whether a severely disabled child, who was fed through a g-tube, could be assisted by a SET or SEHT at school, or whether he had to be assisted by a full-time nurse. The Brenneises are correct that this case involves some of the same statutes and regulations as that one and that the student had some of the same medical needs. But, at most, that case would put the district on notice as to the regulations, which under the first prong of the deliberate indifference test is already assumed. *Duvall*, 260 F.3d at 1139. The case does not shed light on how much training a BSA would require to be able to provide nursing services under California law and whether the district was in compliance with that law under the facts of this case. We therefore affirm the summary judgment entered in favor of the school district on Count IV.

### 3. Count V: the 2007–08 IEP

The implementation of the ALJ's decision in the IEP for the following year is potentially a different matter. In Count V of the Second Amended Complaint, the Brenneises alleged that the school district failed to comply with the ALJ's decision and "knew that it was substantially likely that [T.B.] would not able to safely attend public school or be able to obtain educational benefit from his educational program."[7] In the Brenneises' view, the district illegally "fail[ed] and refus[ed] to ensure the presence of a school nurse to personally assist with [T.B.'s] G-Tube feedings."

The district responds that the ALJ's decision covered the 2006–07 year. As described above, in October 2006 the district amended the December 2006 IEP in the way that the ALJ ordered: it provided that "[a] school nurse will be present and will personally assist the student with the student's G-tube feeding." But by the time the ALJ ordered relief, the 2007–08 school year had already begun. The language ordered by the ALJ did not appear in the draft November 2007 IEP, which covered the 2007–08 school year. The November IEP provided that a nurse would personally assist T.B. with g-tube feeding in his first week at school, at which point a BSA would take over. The November IEP also provided for a total of three hours training for the BSA before he or she took over.

---

[7] In the Second Amended Complaint, the Brenneises also alleged that the district was deliberately indifferent by failing to provide transition services, and in particular occupational therapy, at the same level as before. The Brenneises have not pressed this claim on appeal, and it is therefore waived. *See Arpin v. Santa Clara Valley Transp. Auth.*, 261 F.3d 912, 919 (9th Cir. 2001).

The school district argues that its proposed 2007-08 IEP did not violate T.B.'s civil rights. It observes that the ALJ held specifically that the district was permitted to propose a different classification of employee to assist T.B. with his feedings, "provided that the assistant meets the requirements of Education Code section 49423.5," and that "nothing in this Decision is intended to limit the classification of employee that may be designated pursuant to that code section." The district's position, in effect, is that the due process hearing for the previous school year was irrelevant once the new school year had begun.

We disagree. It is true that an IEP is only valid for the school year to which it applies. But the pertinent issue here is whether a reasonable jury could find that the district violated T.B.'s civil rights by failing to accommodate his need for g-tube feedings. We believe that it could. After the ALJ handed down her decision, the district knew how a judge might interpret California's rules on g-tube feeding and what the district would likely have to do to comply with the rules. A reasonable jury might find that the district was being deliberately indifferent to T.B.'s rights under California law—as opposed to merely negligent or wrong—by refusing to specify that a nurse, SEHT, or SET should carry out the g-tube feedings when the ALJ had suggested strongly that this was the only way in which the district could fulfill its legal duties. Furthermore, a jury might consider that the district's failure to increase the number of hours of training for the BSA in the first week (three hours), was a sign of deliberate indifference, particularly after the ALJ had pointed out that the statute required that an SET or SEHT be trained through "standardized procedures." Indeed, the BSA might never have received those three hours: g-tube feeding took place

once a day during T.B.'s first week at school and lasted about twenty minutes each time.

A factfinder could also conclude, to the contrary, that the district was simply negligent, not deliberately indifferent, in interpreting the ALJ's instructions. The ALJ held that "[n]othing in this Decision is intended to prevent the District from proposing, in a future IEP, that another classification of employee assist [T.B.] with the feedings, provided that the assistant meets the requirements of Education Code section 49423.5." The district may simply have failed to pay enough attention to the final clause. Alternatively, it may have had a good-faith belief that the ALJ was wrong in her construction of California law and sincerely believed that it was not violating T.B.'s rights by failing to provide a nurse, SEHT, or SET to provide g-tube feedings. Or perhaps the district could have provided sufficient evidence under its 2007–08 school year IEP showing that its proposed supervision and training of a BSA would meet the requirements for providing g-tube feedings.

Because there is a genuine dispute of material fact, summary judgment is not appropriate in favor of either party on this claim. We reverse the summary judgment granted in favor of the school district on this claim and remand for further proceedings.[8]

---

[8] The school district argues that the Brenneises failed to exhaust their civil rights claims, including the claim asserted in Count V. In particular, it objects that the Brenneises never alleged in a due process hearing that the district discriminated and retaliated against them by failing to provide staff to perform the g-tube feedings, and that they should have filed for a due process hearing relating to the December 2007 IEP. The g-tube issue was pursued through a due process hearing for the 2006–07 school year, as discussed above, but there was no due process hearing for the 2007–08

### B. Count VII: the retaliation claim

The Brenneises also alleged in the Second Amended Complaint that the district retaliated against T.B. and Mrs. Brenneise for her "aggressive advocacy" on T.B.'s behalf. We affirm the judgment of the district court that a reasonable jury would not be able to find that the district retaliated against the Brenneises.

We apply the Title VII burden-shifting framework, as established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to retaliation claims under the ADA. *See Brown*

---

school year, as the family moved to Minnesota. Claim V presents a claim for the 2007–08 school year. The district court did not discuss the exhaustion issue and did not base the summary judgment on any failure to exhaust.

We held in *Payne ex rel. D.P. v. Peninsula School District*, 653 F.3d 863, 874 (9th Cir. 2011) (en banc), that "[t]he IDEA's exhaustion requirement applies to claims only to the extent that the relief actually sought by the plaintiff could have been provided by the IDEA." Count V of the Second Amended Complaint asserts a non-IDEA claim for discrimination under Section 504 and the ADA. We note that the damages sought in Count V have not been precisely set forth. Although the relief sought, in part, appears to be beyond what could be obtained through the IDEA, including damages for lost educational opportunities for the mother, lost wages and costs incurred in moving to Minnesota, and emotional distress, other requested relief, such as costs the parents allegedly incurred to educate T.B. at home, appears to duplicate the potential IDEA remedy and thus may be subject to the exhaustion requirement. Additionally, neither party has briefed the issues of exceptions to the exhaustion requirement or the effect of the family's move to Minnesota on the viability of the 2007–08 due process hearing. In light of the lack of clarity regarding the types of damages at issue in Count V and the other issues affecting the exhaustion analysis that have not been fully briefed on appeal, we leave the exhaustion issue open on remand for the district court to consider in the first instance.

*v. Tucson*, 336 F.3d 1181, 1186–87 (9th Cir. 2003); *see also Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1121 (9th Cir. 2000) (en banc) ("[W]e join our sister circuits in adopting the Title VII retaliation framework for ADA retaliation claims."), *vacated on other grounds*, *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002). Under the Title VII retaliation standard, a plaintiff must make out a prima facie case "(a) that he or she was engaged in protected activity, (b) that he or she suffered an adverse action, and (c) that there was a causal link between the two." *Emeldi v. Univ. of Ore.*, 673 F.3d 1218, 1223 (9th Cir. 2012). In *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2528 (2013), the Court held that the standard for the "causal link" is but-for causation, a more stringent test. Other circuit and district courts have applied *Nassar* to ADA retaliation claims, and we do as well. *See, e.g.*, *Feist v. La., Dep't of Justice, Office of Att'y Gen.*, 730 F.3d 450, 454 (5th Cir. 2013); *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (en banc)*; Staley v. Gruenberg*, 575 F. App'x 153, 155 (4th Cir. 2014); *Gallagher v. San Diego Unified Port Dist.*, 14 F. Supp. 3d. 1380, 1390–91 (S.D. Cal. 2014). Making out a prima facie case is a necessary, but not sufficient, condition for surviving a motion for summary judgment in the *McDonnell Douglas* framework. *See Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994).

No reasonable jury could find that the Brenneises made out a prima facie case of retaliation. The Brenneises claim that the district retaliated against them by providing for a BSA to perform IEP feedings in the 2007–08 IEP.[9] But no

---

[9] In the Second Amended Complaint, the Brenneises also alleged that the district had retaliated by failing to provide a qualified home teacher.

jury could find that the school district would have provided a nurse, SEHT, or SET in the 2007–08 IEP but for Mrs. Brenneise's aggressive advocacy. There was no evidence that the district's actions were connected to Mrs. Brenneise's advocacy. As discussed above, there were many plausible explanations why the district may have failed to provide a nurse, SEHT or SET. Retaliation was not one of them.

Mrs. Brenneise also claims that the school district required her to "consent" to the IEP before enrolling T.B. in school. The source of this claim is Glynn's letter to Brenneise that the district remained eager for T.B. to begin school at Wangenheim and would start him immediately "if you would consent." The Brenneises claim that, in this context, "consent" means "consent to the IEP" and that Glynn was thus trying to force Mrs. Brenneise to agree to the IEP. But there is no evidence that Glynn was refusing to consider further changes to the IEP to satisfy Mrs. Brenneise. The letter itself stated that if Mrs. Brenneise was "interested in modifications to [T.B.'s] IEP which would allow him to transition more quickly, please contact my office and we will arrange." Furthermore, even if Glynn was not prepared to modify the IEP further to allay Mrs. Brenneise's concerns, a jury would not be able to conclude that Mrs. Brenneise's advocacy was a but-for cause of Glynn's letter. We affirm the district court's summary judgment on the retaliation claim.

---

Like the Brenneises' claim relating to transition services, this claim has not been pressed on appeal and is waived.

## IV.    Attorneys' Fees

The district court granted fees and costs to the Brenneises and their attorneys but awarded only a small fraction of the amount requested.[10]    They submitted a request for $1,398,048.70 in fees and costs for their success in the due process hearing and on appeal to the district court.  The district court awarded only $55,433.91.

When reviewing a court's award of fees for abuse of discretion, we "review the underlying factual determinations for clear error and review de novo any legal analysis relevant to the fee determination."  *Fischel v. Equitable Life Assurance Soc'y of U.S.*, 307 F.3d 997, 1005 (9th Cir. 2002).

The IDEA permits a court  "in its discretion [to] award reasonable attorneys' fees" to a prevailing party.  20 U.S.C. § 1415(i)(3)(B)(i).  The ALJ ruled that the Brenneises had prevailed on Issues 10, 14, and 15 in the due process hearing. The district court held that the Brenneises were a prevailing party under the IDEA.  It rejected the district's claim that the Brenneises had secured only technical or *de minimis* relief

---

[10] The district court's decision on fees was originally filed under seal. It was also filed under seal as part of the record in this court, but the Brenneises moved to unseal it.  The motion was denied because the district court had ruled that "[b]ecause this memorandum contains confidential settlement discussions, the Court files this memorandum under seal until further order of the Court or upon stipulation of the parties."  The parties later jointly moved to unseal the decision in the district court, and the motion was granted.  The parties have not renewed their motion to unseal the decision in this court.  Nevertheless, because the parties have cited to and quoted from the fee decision liberally in their unsealed briefs, and because the decision is unsealed in district court, we order that it be unsealed in this court and treat it that way.

and held: "[T]he ALJ found, and this Court agreed, that the proposed August and December IEPs failed to specify a *qualified* person to assist T.B. with his G-tube feedings. This is an important issue of health and safety."

The limited amount of the award was primarily the result of the court's decision to deny all fees and costs for work performed on and after May 4, 2007, the date the Brenneises rejected the district's settlement offer of $150,000 per year. The court identified two independent grounds to support that decision. First, it concluded that the IDEA barred an award for work performed after that date because the relief that the Brenneises won in the due process hearing was "not more favorable to the parents than the offer of settlement," and the parents were not "substantially justified" in rejecting the settlement. 20 U.S.C. § 1415(i)(3)(D), (E). Second, and independently, the district court exercised its discretion to cut off fees on the ground that any fees and costs incurred after that date were not "reasonable."

We reject both of these grounds. In addition, we conclude that the district court was mistaken about another element affecting the fee award, specifically the nature of the settlement agreement governing the attorneys' fees for the compliance complaint. Moreover, the district court did not sufficiently explain the basis of its calculations for the portion of fees that were awarded. Our decision does not mean that the Brenneises' attorneys are necessarily entitled to a substantially larger award, but the reasoning behind the previous determination cannot be sustained. We therefore vacate the fee award and remand for further proceedings.

42          T.B. v. San Diego Unified Sch. Dist.

### A. The IDEA statutory bar

The critical statutory provisions are 20 U.S.C. § 1415(i)(3)(D) and (E). They provide, in relevant part:

> (D) Prohibition of attorneys' fees and related costs for certain services
>
> > (i) In general
> >
> > Attorneys' fees may not be awarded and related costs may not be reimbursed in any action or proceeding under this section for services performed subsequent to the time of a written offer of settlement to a parent if—
> >
> > > (I) the offer is made within the time prescribed by Rule 68 of the Federal Rules of Civil Procedure or, in the case of an administrative proceeding, at any time more than 10 days before the proceeding begins;
> > >
> > > (II) the offer is not accepted within 10 days; and
> > >
> > > (III) the court or administrative hearing officer finds that the relief finally obtained by the parents is not more favorable to the parents than the offer of settlement.
> >
> > . . . .

(E) Exception to prohibition on attorneys' fees and related costs

> Notwithstanding subparagraph (D), an award of attorneys' fees and related costs may be made to a parent who is the prevailing party and who was substantially justified in rejecting the settlement offer.

Our primary focus is on subsections (D)(i)(III) and (E). In denying fees incurred for work on and after May 4, 2007, the district court concluded that "the relief finally obtained by the parents [wa]s not more favorable to the parents than the offer of settlement" and that the parents were not "substantially justified" in rejecting the offer.

As an initial matter, we must set out our standard of review. We have not yet clearly established the standard that a reviewing court should apply when determining whether the relief obtained in a due process hearing under the IDEA is more favorable than that offered under a settlement. *See, e.g.*, *Capistrano Unified Sch. Dist. v. Wartenberg ex rel. Wartenberg*, 59 F.3d 884, 897 (9th Cir. 1995) (analyzing whether the forerunner of § 1415(i)(3)(D) applied in an attorneys' fee dispute, and holding simply that "[the parents] won a more favorable decision"). But we can draw guidance from Federal Rule of Civil Procedure 68, which is specifically mentioned in § 1415(i)(3)(D)(i)(I). Rule 68 provides that

> At least 14 days before the date set for trial, a party defending against a claim may serve on an opposing party an offer to allow judgment

> on specified terms, with the costs then
> accrued. . . . If the judgment that the offeree
> finally obtains is not more favorable than the
> unaccepted offer, the offeree must pay the
> costs incurred after the offer was made.[11]

Rule 68 is thus clearly animated by the same principles as § 1415(i)(3)(D): if the offeree protracts the litigation by rejecting a favorable offer, he risks suffering a financial penalty. *See Marek v. Chesny*, 473 U.S. 1, 5 (1985) ("The plain purpose of Rule 68 is to encourage settlement and avoid litigation."). Although the language of the IDEA is broader than that of Rule 68—the IDEA cuts off "attorneys' fees and related costs," while Rule 68 speaks of cutting off "costs"—the Supreme Court has held that costs for Rule 68 purposes may include attorneys' fees. *Marek*, 473 U.S. at 9–10. As a district court has noted, the provisions of § 1415(i)(3)(D) "essentially incorporate most of the elements of Rule 68 and expand their application to all offers of settlement in IDEA cases." *B.L. ex rel. Lax v. District of Columbia*, 517 F. Supp. 2d 57, 60 (D.D.C. 2007).

We therefore think that our jurisprudence concerning Rule 68 provides the correct standard for reviewing a district court's decision on the comparative favorability of a settlement offer and a final award under the IDEA. "We review a district court's interpretation of Rule 68 de novo. To

---

[11] Rule 68 was originally even more similar to § 1415(i)(3)(D), as the period in which an offer could be made before trial was ten days, not fourteen. This was changed in the 2009 amendment to reflect the change in the Rule 6(a) method for computing periods less than eleven days. *See* Mark R. Kravitz, Advisory Comm. on Fed. Rules of Civil Procedure, *Report of the Civil Rules Advisory Committee* 33–34 (May 9, 2008); Fed. R. Civ. P. 68 advisory committee's note (2009 Amendments).

the extent the district court's Rule 68 analysis turns on disputed factual findings, we review for clear error." *Champion Produce, Inc. v. Ruby Robinson Co.*, 342 F.3d 1016, 1020 (9th Cir. 2003) (citing *Simon v. Intercontinental Transp. (ICT) B.V.*, 882 F.2d 1435, 1439 (9th Cir. 1989) ("[W]e review *de novo* whether Simon's offer of judgment, MTC's rejection of the offer, and the judgment following the trial satisfied the requirements of Rule 68.")).  In this case, then, we will review the question of relative favorability de novo, while reviewing the factual findings supporting the district court's decision for clear error.

Turning to the merits, it should be recognized that the statute specifies that the comparison of the settlement offer versus the result of litigation must be made from the perspective of the parents.  To deny attorneys' fees under this provision, the court must find that the relief obtained from the ALJ was "not more favorable *to the parents* than the offer of settlement."  20 U.S.C. § 1415(i)(3)(D)(i)(III) (emphasis added).  From the perspective of the school district in this case, it is fair to infer that the ALJ's decision was perceived as a big victory, not just because the district prevailed on most issues, but because the IEP as modified by the ALJ's decision would have cost the district substantially less money than the offer made to the Brenneises.  But that does not necessarily mean that the settlement offer was as good as the ALJ's decision from the point of view of the parents, which is the perspective that counts under the statute.

Similarly, for this purpose the comparison is between the result obtained from the litigation (in this instance, the ALJ's decision) and the settlement offer made by the district.  The settlement offer relied upon by the district court in denying attorneys' fees was the offer to pay $150,000 per year in

exchange for the parents taking responsibility for T.B.'s education themselves and relieving the district of that responsibility. It does not matter that the district may have been willing to provide, and likely would have preferred, the arrangement offered in the IEP. The denial of fees by the district court based on the parents' refusal to accept a settlement offer must be based on the terms of that offer, not on some other offer that could have been made.[12]

The school district's proposal would have required the parents to arrange, on their own, a complete education schedule for T.B. Paragraph 2 stated that "[p]arents take full and complete responsibility for [T.B.'s] education and entire educational program." Paragraph 3 provided that "[p]arents, and each of them, agree to enroll [T.B.] in an educational program or programs that are in full compliance with, and completely satisfy, California compulsory education laws and requirements." Paragraph 8 provided that "[p]arents represent and warrant that they can provide educational services through nonpublic schools, nonpublic agencies and/or other service providers that are appropriate for [T.B.'s] educational needs within the meaning of the IDEA for the amount of money that the District has agreed to provide for the time period covered by this Agreement and that they do not foresee that [T.B.'s] educational needs will change as to warrant any modification of this Agreement, including

---

[12] A comparison of the terms of the proposed IEP with the outcome of the litigation expressed in the ALJ's decision would presumably be relevant in determining the amount of attorneys' fees to be awarded as a reflection of what the Brenneises achieved through the litigation. The district court did not make such assessment in this case, however, instead denying all fees after the rejection of the settlement offer. Our decision does not preclude consideration on remand of the degree of success as a relevant factor in determining the amount to be awarded.

termination, during that period of time." Paragraph 20 provided that any dispute under the Agreement was to be resolved by binding arbitration, with each party to bear its own fees and costs.

The district court gave five reasons for the conclusion that the settlement offer was more favorable than the ultimate relief the Brenneises obtained. First, it stated that the Brenneises' asserted preference for a public school setting was "an after-the-fact rationalization." In the view of the district court, they were willing to accept money even if it meant T.B. would have remained in garage school, but they simply wanted more money than the district offered. Second, "Mrs. Brenneise preferred to keep T.B. at home unless she obtained every item on her long list of demands." Third, the district's monetary offer was "exceptionally generous." Fourth, the offer covered the next five years, the remainder of T.B.'s status as a minor, and would have "put to rest all disputes for the next five years." Fifth, each of the district's offers included reasonable attorneys' fees and costs.

We disagree with the district court's conclusion. For a number of reasons, we conclude that the settlement offer made by the district was not more favorable from the perspective of the parents, such that the statutory bar should not have applied.

### 1. Attorneys' fees and costs up to the settlement

We start with the final reason cited by the district court for reaching the opposite conclusion, the payment of the Brenneises' attorneys' fees and costs up to that point. The offer made by the district did not provide for the payment by

the district of those fees and costs. The district court's finding to the contrary was clearly erroneous.

The settlement agreement proposed by the district in May 2007 explicitly provided in Paragraph 18 that "[a]t no time shall this Agreement be construed to confer prevailing party status on either party. Except as otherwise provided herein, each party to this Agreement shall bear his/her/its own costs, expenses, and attorneys' fees, whether taxable or otherwise, connected with the disputes resolved by this Agreement."

The cover letter from the district's attorney, dated March 13, 2007, that accompanied an earlier version of the proposed settlement agreement said that it was understood that the parties had agreed that the district would pay reasonable attorneys' fees and that the district was "open to including" payment of the fees. However, that letter did not state either how much would be paid or how that amount would be determined. Moreover, the proposed settlement agreement enclosed with that letter contained language identical to the language quoted in the preceding paragraph from the May settlement agreement, and that language did not provide for the payment of those fees. Obviously, an agreement could have been drafted to provide for the payment of fees and costs, but the document sent to the Brenneises said something very different. The cover letter that accompanied the May settlement agreement made no mention of attorneys' fees.

In its brief to us, the district contended that its offer "also included reasonable attorneys' fees assuming the parties could agree upon an amount." It is always true, of course, that parties could agree to something different, but that is not what the proposed agreement itself actually said. Instead, the agreement proposed by the district explicitly stated that each

party would bear its own fees and costs. The agreement contained an integration clause stating that it contained the entire agreement. The Brenneises should not have been required to assume differently in evaluating the offer. Nor should we assume something different in evaluating whether the district's offer was more favorable than the relief obtained. *See Holland v. Roeser*, 37 F.3d 501, 504 (9th Cir. 1994) ("[W]e have held that courts should apply the usual rules of contract interpretation to offers of judgment, and these rules dictate that ambiguities be construed against the drafter." (citation omitted)); *Erdman v. Cochise Cnty., Ariz.*, 926 F.2d 877, 880 (9th Cir. 1991) (same); *Webb v. James*, 147 F.3d 617, 623 (7th Cir. 1998) ("Because Rule 68 puts plaintiffs at their peril whether or not they accept the offer, the defendant must make clear whether the offer is inclusive of fees when the underlying statute provides fees for the prevailing party. As with costs, the plaintiff should not be left in the position of guessing what a court will later hold the offer means.").

By the terms of the proposed agreement, the Brenneises would not have been able to seek an award for fees and costs already incurred, including the activity for which the district court later awarded $55,433.91. By declining the offer, the Brenneises retained the right to seek an award of fees and costs. In that way, the offer was less favorable than the relief obtained.

## 2. The duration of the agreement and the "stay put" provision

The fourth reason cited by the district court in support of its conclusion was that the proposed settlement would "put to rest all disputes for the next five years." Unfortunately, that

was not necessarily true. The agreement explicitly provided that, after a specified period, perhaps as short as one more academic year, T.B.'s parents could re-enroll him into a district school.[13]

That was a provision added to the May settlement offer by the school district to make the offer more attractive to the parents. To the extent that the agreement limited the options available to T.B. for a longer period, that did not necessarily make it more favorable than the ALJ's decision from the parents' perspective.

There were many reasons why the parents may have wanted the option to re-enroll T.B. in a district school at some point in the future. Over time, his condition and needs could change, for better or worse. Recognizing that the needs of a student with disabilities change over time, an IEP is customarily prepared on an annual basis. *See* 20 U.S.C. § 1414(d)(4)(A)(i)–(ii). If T.B.'s condition worsened or if the parents determined that they were not able to provide T.B. with a sufficient program, even with an annual $150,000 payment from the school district, it is understandable that they would want to retain the option to return responsibility for T.B.'s education back to the school district, where that responsibility customarily rests. The IDEA and California law both impose responsibility on local school districts to provide

---

[13] At what point T.B. could be reenrolled was not entirely clear. The offer itself appears to preclude T.B.'s return to the district until the 2009–10 school year. The cover letter that accompanied the settlement offer suggested that the parents could reenroll T.B. in the district any year after the upcoming 2007–08 school year, or as early as the 2008–09 school year. This confusion regarding a material term of the offer may alone have substantially justified the parents' rejection of the offer. *See* 20 U.S.C. § 1415(i)(3)(E).

a free appropriate public education for children with disabilities. 20 U.S.C. § 1400(d)(1)(A); Cal. Educ. Code § 56000 *et seq.* From the perspective of the parents, therefore, it would not have been an advantage for the agreement to extend as long as the district court presumed that it would.

Moreover, under the proposed settlement agreement, the proposed terms for any return to school by T.B. would have been unfavorable for the Brenneises. If the parents elected to return T.B. to a district school, an IEP would have to be prepared and an effort made to reach agreement about the program to be provided to T.B. The potential for disagreement at that point is obvious.

The offer provided that "[s]hould Parent dispute the District's offered program, the Parties also agree [T.B.'s] stay put placement will be the District's offered program pending resolution of the dispute." In other words, if T.B. proposed to return to a district school, but he or his parents were unhappy with the program offered by the district, he would be forced to accept whatever program the school district proposed while the parties agreed on how to settle the issue or went to arbitration. T.B. would not have the option of continuing his prior placement in the meantime, no matter how unsuitable the district's program was or how much better his previous educational program was.

Stay-put provisions "direct[] that a disabled child 'shall remain in [his or her] then current educational placement' pending completion of any review proceedings, unless the parents and state or local educational agencies otherwise agree." *Honig*, 484 U.S. at 308 (second alteration in original) (quoting 20 U.S.C. § 1415(e), the predecessor of the current

stay-put provision, § 1415(j)).  This is an important right for parents and students: the school district cannot change a placement over the parents' objection until review proceedings are completed.  *Id.* at 324.  Under the so-called stay-put provision in the settlement offer, however, T.B. could not continue his prior program if he objected to what the district proposed for him.  It would not, in fact, have allowed T.B. to "stay put" in what he already had.

The Brenneises were justified in being wary of such a provision.  Their dissatisfaction with T.B.'s education had led them to withdraw him from school in 2003, and in 2006 he had lasted only five days at Coronado Academy before that school asked him to leave.  The Brenneises had recently prevailed against the district in a compliance complaint related to his brief attendance at Coronado.  The stay-put provision contained in the district's settlement offer gave the district leverage it would not have had otherwise.  If T.B. asked to return to a district school, he would have been required to accept whatever the district offered, for at least some period of time.  That fact alone might well have deterred T.B. and his family from ever seeking to return to public school, meaning that the district's offer of the option to permit the re-enrollment of T.B. after a year or two may not, in real terms, have been much of an option at all.

In light of the term allowing T.B. to enroll in a district school after one or two years, it does not appear that the district court's finding that the settlement agreement would have put to rest all disputes for the next five years was entirely correct. To the extent that the agreement might have made it difficult for the parents to return T.B. to public school, the duration of the agreement and the stay put

provision were not more favorable from the parents'
perspective.

### 3.   The cash settlement amount

The first three reasons identified by the district court to
support its conclusion that the settlement offer was more
favorable for the parents than the ultimate relief they obtained
do not appear to us to amount in fact to three separate
reasons.  Indeed, the first two—that the parents' expressed
preference for a public school was an "after-the-fact
rationalization" and that Mrs. Brenneise actually preferred
to keep T.B. at home—amount to the same observation.  The
district court reasoned, in essence, that because the parents
had no genuine interest in a district placement, certain
unfavorable terms of the offer—such as requiring the parents
to assume sole responsibility for T.B.'s education and
correspondingly absolving the district of responsibility—did
not in fact make the offer unfavorable.  Under that view, if
the parents actually desired complete separation from the
district, then these terms should not be considered
unfavorable aspects of the offer.

We do not accept this line of reasoning. The record does
not support the proposition that the parents were interested
only in a cash-out alternative and not also in a
district-administered placement in a district school.  Nor does
it support the proposition that the parents pursued their IDEA
complaint solely to obtain leverage over the district in an
attempt to exact a larger cash settlement.  The record shows
the parents pursued a district-administered FAPE through the
ALJ proceedings because they were genuinely interested in
a district placement.  We do not discount the evidence that the
parents were also interested in a cash-out option, and in fact

may at some time have preferred it, at least in light of the drawn out disagreements with the district. However, they clearly continued to value the alternative of placing T.B. in a district school. Indeed, although the parents proposed a cash-out settlement, their settlement offer also would have given them the annual option to re-enroll in the district schools. Furthermore, when the parents moved the family to Minnesota, they placed T.B. in a public school, where he appears to have thrived. Accordingly, we conclude that the district court erroneously assumed that the cash settlement offer was more favorable because the Brenneises preferred to educate T.B. privately as opposed to sending him to public school.

The remaining reason given by the district court to support its conclusion was the proposition that the school district's offer of $150,000 per year was "exceptionally generous." On closer examination, though, that characterization seems exaggerated. The annual payment of $150,000 would not have covered the cost of the existing home school arrangement, which was both what the district court found that the parents wanted and what T.B. was entitled to, as the "stay put" arrangement, during the pendency of the dispute. That program was calculated to cost the school district $157,000 per year. If the parents elected to continue the arrangement that was then in place, they would have had to reach into their own pockets to make it happen.

The additional costs imposed on them might actually have exceeded the difference between $157,000 and $150,000. A case manager from the school district was involved in arranging garage school for T.B., for example. Under the settlement offer, the Brenneises would have taken full

responsibility for arranging services for T.B., requiring additional time or additional expense to hire someone else to do it.  Furthermore, T.B. was an individual customer in the special education market, while the district was a repeat player and had more bargaining power.  It might have cost more for the Brenneises to arrange to have T.B. educated privately or to have obtained assistance from external service providers than it cost the district.

From this perspective, the school district's offer of an annual cash payment was not so generous.  It would not have covered the expenses of T.B.'s then-current program.  The IDEA "was intended to give handicapped children both an appropriate education and a free one; it should not be interpreted to defeat one or the other of those objectives." *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 372 (1985).  T.B.'s education would not necessarily have been free.

We are unable to conclude, as the district court did, that the settlement offer was more favorable to the parents than the result of the hearing.  Although the ALJ ruled in favor of the school district on most of the issues, the ultimate conclusion of the due process hearing was that the program offered by the district would not have provided T.B. with a FAPE.  Both the August 2006 IEP and the December 2006 IEP had fatal shortcomings.  The district court affirmed that determination, and the school district did not appeal.  Had the parents accepted the settlement offer, they would not have obtained that result; they would have waived their claim for attorneys' fees and costs; they would have been precluded from re-enrolling T.B. in public school for at least some period of time, even if his condition changed; in the event of re-enrollment, if there was a disagreement over the

appropriate program for T.B., during the pendency of that dispute they would have agreed to forego the right to maintain his then-current program as the stay put arrangement and instead would have been required to accept whatever the school district offered; and if they chose to continue the garage school program, they would have been required to pay for part of it with their own funds. Based upon the facts of this case we conclude, contrary to the district court, that the settlement offer was not as favorable to the parents as the ALJ's decision.

In addition, we conclude that the parents were "substantially justified" in rejecting the May 4 settlement offer, under the exception provided in 20 U.S.C. § 1415(i)(3)(E). Even if we agreed that the result obtained through the ALJ hearing was not "more favorable to the parents" than the terms of the May 4 offer, perhaps because the parents did in fact prefer to educate T.B. at home, that does not end the question. Subsection (E) establishes an exception to the statutory bar that applies even if a determination were made under 20 U.S.C. § 1415(i)(3)(D)(i) that the settlement offer was more favorable: "Notwithstanding subparagraph (D), an award of attorneys' fees and related costs may be made to a parent who is the prevailing party and who was substantially justified in rejecting the settlement offer." As discussed above, the parents qualified as a prevailing party. Even if the May 4 offer could be considered more favorable from the parents' perspective in the aggregate, it was clearly less favorable to the parents in several material respects, as described in the preceding paragraph. These inferior aspects of the district's offer establish that the parents were "substantially justified in rejecting [it]." *Id*. § 1415(i)(3)(E). Fees for services on and

after May 4, 2007 should not have been denied based on the IDEA's statutory bar.[14]

## B.  Reasonableness

The district court's second rationale for reducing the fee award was based on the perceived unreasonableness of the claim for fees.  The court held that "[e]ven if the IDEA's provision did not strictly apply to the facts, the Court, in its discretion, would not award the Brenneises fees after they

---

[14] We make clear that we do not hold as a matter of law that there is anything improper about an arrangement along the lines of the settlement proposal here, under which the school district would pay a certain amount for a given period and the parents would take responsibility for the child's education program.  The IDEA favors settlement of disputes between parents and school districts.  *See, e.g.*, *D.R. ex rel. M.R. v. E. Brunswick Bd. of Educ.*, 109 F.3d 896, 901 (3d Cir. 1997) ("[P]ublic policy plainly favors upholding the settlement agreement entered between D.R.'s parents and the Board."); *cf. McDermott, Inc. v. AmClyde*, 511 U.S. 202, 215 (1994) (noting in another context that "[p]ublic policy wisely encourages settlements").  A cash settlement would not provide for education of the child in the public school, the approach preferred under the IDEA, but in some circumstances it may be the best course for the child, consistent with the IDEA.

However, we also caution that a district should not be able to threaten parents that they might be denied attorneys' fees and costs and be forced to bear the expense of litigation themselves thereafter by declining to accept an offer that absolves the district of responsibility, even if the monetary settlement offered would cover the costs for the parents to personally oversee or provide for their children's education.  The IDEA and California law impose responsibilities on local school districts for the education of children with disabilities.  20 U.S.C. § 1400(d)(1)(A); *see, e.g.*, Cal. Educ. Code § 56000 *et seq.*  For parents who express a preference for the school district to assume those obligations, failure to settle for a cash payout should not trigger the statutory bar.

unreasonably rejected the May 3, 2007, favorable settlement offer."

The district court relied on two factors in exercising its discretion. First, it held that T.B. received no benefit from the due process hearing. Second, the district court found that "the Brenneises unreasonably rejected the May 3, 2007, settlement offer." We disagree on both scores.

### 1. The benefit that T.B. obtained

The district court reasoned that T.B. never benefitted from his victory in the due process hearing because "[t]he Brenneises never implemented the [ALJ]'s Decision on the three issues that had been decided in their favor. Instead, they chose to maintain the Stay Put placement through T.B.'s 2006–07 and 2007–08 school years that had kept him in garage school since the parents had removed him from public school in 2003." Even after the district court upheld the ALJ's ruling in June 2010, the school district's conduct did not change, because T.B. had moved out of the district and had been living in Minnesota "for two years by the date of that decision."

We disagree with the district court's conclusion that the Brenneises did not obtain any benefit from the court hearing. First, this finding is in conflict with its ruling that they were the "prevailing party." Indeed, the district court cited Supreme Court precedent that a "plaintiff 'prevails' when *actual* relief on the merits of his claim *materially alters* the legal relationship between the parties by modifying the defendant's behavior in a way that *directly benefits the plaintiff*." *Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992) (emphasis added by district court); *see also Bd. of Educ. of*

*Downers Grade Sch. Dist. No. 58 v. Steven L.*, 89 F.3d 464, 468–69 (7th Cir. 1996) (holding that the definition of prevailing party under 42 U.S.C. § 1988, as discussed in *Farrar*, is the same as that used in the IDEA). If, as the district court correctly held, the Brenneises had prevailed, they also necessarily obtained an actual benefit.

This case is unusual in that the Brenneises did not take advantage of the benefit they received through the ALJ's decision, but that is not automatically fatal to their fee request. As the district court found in connection with the prevailing party discussion, the Brenneises changed the legal relationship between the parties in their favor and secured the option of relief. The failure to exercise that option does not render the relief nonexistent. *See, e.g., M.L. v. Fed. Way Sch. Dist.*, 401 F. Supp. 2d 1158, 1163 (W.D. Wash. 2005) ("An option need not be exercised in order to be 'more favorable [than a settlement offer].'"), *vacated on other grounds*, 394 F.3d 634, 638 (9th Cir. 2005); *M.C. ex rel. C.M. v. Bd. of Educ. of Whitesboro Cent. Sch. Dist,* No. 97-CV-1533, 1998 WL 951675, at *3 (N.D.N.Y. Sept. 1, 1998) (holding that the plaintiffs had prevailed because "[t]he availability of this option for M.C. changed the legal relationship to the plaintiffs' benefit . . . .").

That the Brenneises moved to Minnesota did not render the relief illusory. It is true that the educational relationship between T.B. and the district ended in 2008 when the Brenneises left San Diego. But they had still earned relief before they left in the form of an enforceable judgment. It is the relief that they earned "at the time of the judgment or settlement" that is important. *Farrar*, 506 U.S. at 111.

Furthermore, it would be perverse to deny plaintiffs fees for the supposed failure to exercise an option when some of the blame for that failure may lie with the defendants. By way of illustration, a defendant should not be able to lose in court, resist and delay enforcement of the relief awarded, and then attempt to escape payment of attorneys' fees on the ground that the plaintiff never took advantage of the relief. As discussed earlier in relation to the summary judgment on Count V of the Second Amended Complaint, there is outstanding a genuine dispute of material fact as to whether the district was deliberately indifferent to T.B.'s rights by failing to abide by California's g-tube feeding standards. It could be found that the district hampered T.B.'s return to school, in which case the failure of the Brenneises to take advantage of the ALJ decision could fairly be attributed to the district's own actions.

On remand the district court should take into account the value of the relief obtained and may consider the reasons why the Brenneises did not exercise the relief they won. *See Aguirre v. L.A. Unified Sch. Dist.*, 461 F.3d 1114, 1117–21 (9th Cir. 2006) (explaining that fees under the IDEA should reflect the degree of success obtained by the plaintiffs). The fact that the family moved to Minnesota did not mean that they could not have obtained any benefit.

2.   Unreasonable rejection of the settlement offer

The second factor that the court cited in the exercise of its discretion was that "the Brenneises unreasonably rejected the May 3, 2007, settlement offer." In the court's view, "the Brenneises demanded an extremely high payment and took an all-or-nothing approach. Either they secured every demand on their lengthy list or T.B. would remain in garage school.

Settlement requires both sides to make concessions, but the parents were unwilling to compromise to reach a fair result." On that basis, the court denied all fees and costs for work done on and after May 4, 2007. That denial was an abuse of discretion. For the reasons noted above in support of our conclusion that the settlement offer was not as favorable for the parents as the ALJ's decision, the district court's finding that the Brenneises acted unreasonably in rejecting that offer was clearly erroneous.[15]

## C.   The fee calculation

The district court did award a total of $55,433.91 for fees and costs incurred prior to May 4, 2007. We vacate that award and remand for further consideration.

### 1.   The compliance complaint

As described above, the Brenneises filed a request for a Compliance Complaint Investigation with the California Department of Education in July 2006. They alleged that the district had failed to implement T.B.'s July 2006 extended school year IEP. The compliance complaint report, published in November 2006, provided 24 hours of English language arts instruction and 80 minutes of adapted physical education instruction as a remedy.

---

[15] We note in particular that the district court clearly erred in its apparent belief that the school district had previously offered $200,000 per year to settle the case, more than it was currently paying for garage school. More broadly, it is not apparent that the inability to reach agreement was entirely the responsibility of the Brenneises. As the district court itself observed in the same order, "[b]oth sides [were] responsible for creating and fostering the animosity that impaired an efficient resolution to the case."

In October 2007, the Brenneises' attorneys sent the district a demand for $7,113.50 in fees and costs in connection with the compliance complaint. In November 2007, the district offered $3,500 for their work in securing the compensatory education.

In the district court action filed by the school district in January 2008, the district sought a declaratory judgment that it was not liable to pay any fees in relation to the compliance complaint. The Brenneises then amended their district court complaint to seek reasonable fees for that activity, relying on *Lucht v. Molalla River School District*, 225 F.3d 1023 (9th Cir. 2000), in which we held that a party who prevails in a state's complaint resolution procedure can recover attorneys' fees.

In May 2011, the Brenneises accepted an offer of judgment from the school district for "Recovery of Reasonable Attorneys' Fees in Connection with a CDE Compliance Complaint[] in the sum of $7,113.50, plus reasonable attorney's fees and costs incurred by plaintiffs [in seeking that sum] prior to the date of this offer in an amount to be set by the Court."

The Brenneises sought $48,173.00 in fees and costs for obtaining the original $7,113.50 fee award. The district court denied these fees because "the parties previously settled their dispute as to the amount of attorneys' fees recoverable in connection with that 2006 State proceeding."

It appears that the district court was mistaken about the parties' May 2011 agreement. The court did not state that it viewed the amount of "reasonable attorneys' fees" for recovering the $7,113.50 in fees and costs as zero; rather, it

considered that this dispute was already settled.  All that was settled, however, was the payment of $7,113.50 for fees and costs previously incurred in connection with the compliance complaint itself.  The May 2011 settlement itself explicitly provided for additional fees and costs, in an amount to be determined by the court, incurred by the Brenneises in seeking that payment.  That part of the claim was not settled, so rejection of that claim on the ground that it had been settled was incorrect.  On remand, the court should determine what fees are owing for recovering the $7,113.50 for the compliance complaint.

### 2.  The detail in the fee and costs award

The Brenneises also object that the district court did not sufficiently explain its fee award.  We agree.

The district court ruled that the Brenneises were eligible to recover the "reasonable fees and related costs that were incurred before May 4, 2007, when they rejected the School District's favorable offer to settle the IDEA issues."  The court used the lodestar approach.  First, it determined the reasonable billing rates for the attorneys and staff involved in the case, based on their experience and the location.  It then determined the "reasonable hours" for services rendered before May 4, 2007.  The court went through each of the different categories of work for which the Brenneises requested compensation and adjudicated the district's objections to the hours billed.

As we held in *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008), "[w]hen the district court makes its award, it must explain how it came up with the amount."  Here, it is not possible for us to determine how the court

arrived at the amount of its award.  Because there was a large difference between the fee request and the fee award—the court only awarded about five-ninths of what the Brenneises were requesting up to May 4, 2007—some greater explanation of its adjustments is in order.  *See id.*

There were two main problems with the court's explanation.  First, the court did not state how it reduced the billable time for each category of work.  For example, the court "award[ed] reasonable hours to review the School District's request for a Due Process hearing, to discuss a strategy for responding to it, to consult with experts, and to gather evidence," but did not state what these reasonable hours were.  As another example, the court "largely overrule[d] objections to the amount of time the firm spent in internal conferences," but did not say to what extent it sustained the objections.  Relatedly, the district court did not say how it was reducing the fees for each lawyer in each work category.  Cutting an hour off the time claimed by one of the partners in the case, whom the court decided to compensate at $425 an hour, had a much larger effect than cutting an hour off the time billed by the associate, whom the court compensated at $125 an hour, and the paralegal, who was compensated at $95 an hour.

Second, the court stated that it "significantly cut" the time that the Brenneises sought to be compensated for the fifteen out of the eighteen issues on which they lost in the due process hearing.  But the court did not explain by what percentage it cut the time or why, nor did it explain which work it assigned to each losing issue.  As we held in *Padgett v. Loventhal*, 706 F.3d 1205, 1209 (9th Cir. 2013), "[f]ailure on a claim does not automatically reduce the fee award."  Rather, "where attorney work proves beneficial to a

successful claim, district courts should generally award these fees in full, even if the work is also useful to an unsuccessful claim." *Id.* Where work is only useful to an unsuccessful claim, the fee request should be denied. *See id.* Because the court did not explain how it reduced the time "devoted to losing issues," or even what time was devoted to losing issues, the Brenneises are unable to object in any detail to the court's determination and we are unable to effectively review it.

We acknowledge that a precise explanation for each reduction from the fees counsel sought may be difficult, and we recognize that the district court may make general, across-the-board adjustments. However, because the reduction in this case "passes well beyond the safety zone of a haircut . . ., the district court's justification for the cuts must be weightier and more specific." *Moreno*, 534 F.3d at 1113. "The explanation need not be elaborate, but it must be comprehensible." *Id.* at 1111. *See also Ferland v. Conrad Credit Corp.*, 244 F.3d 1145, 1151 (9th Cir. 2001) (remanding the fee award because the district court "did not explain except at the most general level why it reduced by more than half the number of attorney hours for which [the plaintiff] could be compensated, and did not explain at all the particular level of reduction . . . chosen" (footnote omitted)); *Gates v. Deukmejian*, 987 F.2d 1392, 1400 (9th Cir. 1992) (remanding fee award because "the district court . . . failed to articulate a 'concise but clear' explanation for why the ten percent across-the-board reduction, when coupled with plaintiffs' discrete billing judgments, properly compensated for plaintiffs' overbilling or duplication").

The court's ruling on nontaxable costs suffered from the same lack of clarity, although the absolute effect is much

smaller.[16]  For example, the court reduced the Brenneises' photocopying request from approximately $8,200 to $4,394 "to reflect the limited degree of success."  On remand, the court should strive to explain its reductions more precisely.

## V. Conclusion

We affirm the district court's grant of summary judgment in favor of the school district as to Counts IV and VII of the Second Amended Complaint.   We reverse the grant of summary judgment as to Count V.  We vacate and remand the award of attorneys' fees and costs.  Each party shall bear its own costs on appeal.

**AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.**

---

[16] The court did not rule on taxable costs under 28 U.S.C. § 1920, preferring that these be addressed by the clerk of court at the end of the litigation.